CEDAR RAPIDS TELEVISION
COMPANY, d/b/a KCRG–
TV9, Plaintiff,

v.

MCC IOWA LLC and MCC Illinois
LLC, Defendants.

No. 07–CV–124–LRR.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Nov. 30, 2007.

John M. Bickel, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Plaintiff.

## ORDER

LINDA R. READE, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION AND RELEVANT PROCEDURAL BACKGROUND ........1128

II. JURISDICTION ................................................1129

III. FINDINGS OF FACT ...........................................1129
 A. Parties and Players ......................................1129
 B. Jargon: "Must–Carry" v. "Retransmission Consent" ...................1130
 C. 1997 Retransmission Consent Agreement ............................1131
 D. Changes in the Industry .............................................1131
 E. Relevant Communications Between the Parties ........................1132
 F. Communications in 2007 .........................................1133

IV. CONCLUSIONS OF LAW ......................................1134
 A. Parties' Arguments .............................................1134
 B. Analysis ......................................................1135
 1. Applicable law ...........................................1135
 2. Declaratory Judgment Act .................................1135
 3. Adequacy of 2005 Letter .................................1136

V. JUDGMENT .................................................1138

## I. INTRODUCTION AND RELEVANT PROCEDURAL BACKGROUND

The matter before the court is Plaintiff Cedar Rapids Television Company's, d/b/a KCRG–TV9 ("KCRG"), Complaint and Demand for Jury ("Complaint") (docket no. 2).

On October 31, 2007, KCRG filed the Complaint. On November 2, 2007, Defendants MCC Iowa LLC and MCC Illinois LLC (collectively "Mediacom") filed an Answer.

On November 15, 2007, Mediacom filed a trial brief ("Mediacom's Trial Brief") (docket no. 7). On November 16, 2007, KCRG filed a trial brief ("KCRG's Trial Brief") (docket no. 8).

On November 16, 2007, the court commenced a bench trial[1] on the Complaint.

---

1. In the Complaint, KCRG demanded a jury trial, pursuant to Federal Rule of Civil Procedure 38. See Fed.R.Civ.P. 38(b) ("Any party may demand a trial by jury on any issue triable of right by a jury...."). However, on November 16, 2007, in open court, KCRG and Mediacom both consented to a bench trial. See Fed.R.Civ.P. 38(d) ("A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.").

Fed.R.Civ.P. 57 ("The court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar."). The bench trial concluded on the same day. Attorneys John M. Bickel and Mark A. Zaiger represented KCRG. Attorney Mark McCormick represented Mediacom.

On November 20, 2007, KCRG filed Plaintiff's Supplemental Trial Brief (docket no. 11) and Mediacom filed Reply Brief and Argument of Defendants MCC Iowa and MCC Illinois (docket no. 12).

The court finds the matter fully submitted and ready for decision. This order constitutes the court's Federal Rule of Civil Procedure 52(a) findings of fact and conclusions of law.

## II. JURISDICTION

■ The Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, does not confer jurisdiction upon federal courts. *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *see Mo. ex rel. Mo. Hwy. & Transp. Comm'n v. Cuffley,* 112 F.3d 1332, 1334 (8th Cir.1997) (stating that the Declaratory Judgment Act "is a procedural statute, not a jurisdictional statute"). Therefore, a federal court must gain its power to issue declaratory judgments from some independent basis of jurisdiction. *Cuffley,* 112 F.3d at 1334; *Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles County, Inc.,* 977 F.2d 1224, 1227 (8th Cir.1992).

■ KCRG claims there is diversity jurisdiction, pursuant to 28 U.S.C. § 1332. KCRG is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. MCC Iowa LLC and MCC Illinois LLC are both Delaware corporations with their principal places of business in Wilmington, Delaware. Therefore, there is complete diversity between the opposing parties. *Caterpillar Inc. v. Lewis,* 519 U.S. 61, 68, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996) (construing § 1332(a) to find a requirement that "the citizenship of each plaintiff is diverse from the citizenship of each defendant"). The amount in controversy exceeds $75,000.00. The court is satisfied it has subject matter jurisdiction over this case, and it is appropriate for the court, under the Declaratory Judgment Act, to determine the rights and duties of each of the parties.

## III. FINDINGS OF FACT

After assessing the credibility of the two trial witnesses, the court finds the following facts by a preponderance of the evidence:[2]

### A. Parties and Players

KCRG is a television station. Specifically, it is an ABC affiliate that serves a designated marketing area ("DMA"), consisting of twenty-one Iowa counties and including four major cities: Cedar Rapids, Waterloo, Dubuque and Iowa City. There are about 160 different cable systems within KCRG's DMA.

Mediacom is a cable company that is a subsidiary of Mediacom Communications Corporation and Mediacom Broadband LLC. It is one of the cable systems within KCRG's DMA.

John Phelan is the Vice President and General Manager of KCRG. He has been employed with KCRG since 1984 and been in management since 1990. In 1998, Phelan began working in his current positions.

---

**2.** During the trial, Mediacom made objections to John Phelan's testimony. The court took some of the testimony subject to the objections and some as offers of proof. The court now overrules such objections, deems the objected-to evidence admissible and considers the evidence presented in the offers of proof.

Jane Belford is the Vice President of Programming and Legal Affairs for Mediacom Communications Corporation. She is an in-house attorney who negotiates contracts with large programmers. Since 1999, Belford has been handling business with Mediacom's "must-carry" stations and "retransmission consent" stations.[3]

### B. Jargon: "Must–Carry" v. "Retransmission Consent"

The Federal Communications Commission ("FCC") regulates commercial television stations and cable companies. All commercial television stations in the United States must elect either "must-carry" status or "retransmission consent" status with cable companies in the station's DMA. *See* 47 C.F.R. § 76.64(f)(2) (2007) ("Commercial television stations are required to make elections between retransmission consent and must-carry status . . . at three year intervals . . . .").[4] If a station is a "must-carry" station, the cable company is required to carry the station's signal. 47 U.S.C. § 534; 47 C.F.R. § 76.56(b); *see also* KCRG's Trial Brief (docket no. 8–2), at 1 ("[L]ocal commercial . . . television broadcast stations may require a cable operator that serves the same market as the broadcaster to carry its signal."). If the station is a "retransmission consent" station, the cable company has received the station's permission to transmit the station's signal in exchange for some agreed-upon compensation from the cable company. 47 U.S.C. § 325(b);

47 C.F.R. § 76.64; *see also* KCRG's Trial Brief (docket no. 8–2), at 3 ("[S]tations must decide whether to demand carriage on local cable systems without receiving compensation or elect to negotiate a retransmission consent agreement.").[5] When retransmission consent status is in effect, the cable company cannot carry the local station's signal without the consent of the local station. 47 U.S.C. § 325(b)(1); 47 C.F.R. § 76.64(a). Retransmission consent is typically granted through a retransmission consent contract.

Each commercial television station must do this election every three years, and the cycle years are set by the Code of Federal Regulations. 47 U.S.C. § 325(b)(3)(B); 47 C.F.R. § 76.64(f)(2). Stations were required to elect by October 1, 2005, for the period of 2006, 2007 and 2008. The next election must be made by October 1, 2008. An election must be in writing and sent to the cable companies via certified United States mail. 47 C.F.R. § 76.64(h). If a station fails to send a notice of election, the default status is must-carry. *Id.* § 76.64(f)(3). However, a station may elect a must-carry status, that is, a station may send a notice to a cable company affirmatively seeking to be in a must-carry status.

In addition to the three-year election cycle, stations and cable systems may have retransmission consent contracts that cover all or part of the three-year election period. In other words, the retransmis-

---

**3.** The court will discuss these terms *infra* Part III.B.

**4.** Just prior to the commencement of the bench trial, KCRG filed Plaintiff's Request that the Court Take Judicial Notice (docket no. 9) of 47 C.F.R. § 76.64 and 47 C.F.R. § 76.65. The court granted such request during the bench trial.

**5.** The FCC's July 2000 Fact Sheet provides, in part:

The Communications Act [of 1934, as amended,] prohibits cable operators . . . from retransmitting commercial television . . . without first obtaining the broadcaster's consent. This permission is commonly referred to as "retransmission consent" and may involve some compensation from the cable company to the broadcaster for the use of the signal. . . .

KCRG's Trial Brief (docket no. 8–2), at 1.

sion consent contract's period need not coincide with the election cycle. Such contracts must be in writing and they must "specify the extent of the consent being granted." *Id.* § 76.64(j). The parties to the contract are free to choose the duration of the retransmission consent contract, and they are free to modify their contract during the period of effectiveness. Commercial television stations and cable companies are obligated, pursuant to federal regulations, to negotiate retransmission consent contracts in good faith. 47 U.S.C. § 325(b)(3)(C); 47 C.F.R. § 76.65(a).

If a commercial television station elects retransmission consent status with a particular cable company and then fails to enter into a retransmission consent contract with that company, the station's signal may not be broadcast on the cable network. In other words, the existence of a retransmission consent contract is the only way a station's signal will be broadcast on a cable system if the station has elected retransmission consent (instead of must-carry) for that particular cable company. *See* KCRG's Trial Brief (docket no. 8–2), at 3 ("Until the cable operator and the television station reach an agreement, the cable operator is prohibited from carrying that station's signal.").

### C. 1997 Retransmission Consent Agreement

On May 16, 1997, TCI Cable Management Corporation ("TCI") entered into a Retransmission Consent Agreement ("Agreement") with KCRG. TCI drafted the Agreement's terms. The Agreement provides in part:

5. *Term.* The term of this Agreement shall commence on the date hereof and shall expire on December 31, 2001 (the "Initial Term"). This Agreement and the election set forth in Paragraph 1 hereof shall automatically renew for successive six (6)-year periods after the ex-piration of the Initial Term (each a "Renewal Term"); provided, however, that either party may terminate this Agreement effective as of the end of the Initial Term or any Renewal Term upon six (6) months' prior written notice to the other party or as otherwise provided in this Agreement.

Mediacom Trial Ex. A (docket no. 2–3), at ¶ 5.

In June of 2001, Mediacom acquired a cable system from a third party that includes the area served by KCRG—Mediacom became the successor-in-interest to TCI. On October 5, 2001, Mediacom informed KCRG that Mediacom was assuming all of the obligations of the Agreement. Mediacom Trial Ex. A–1. Because KCRG elected retransmission consent status in 1999 (for the election period of 2000, 2001 and 2002), Mediacom either had to assume the obligations of the Agreement or enter into negotiations for a new retransmission consent arrangement. When Mediacom assumed the Agreement, it had already automatically renewed one time, because neither TCI nor KCRG had given the other written notice six months prior to December 31, 2001.

Paragraph 6 of the Agreement entitles KCRG to a CNN Headline News Local Edition insert. *Id.* at ¶ 6. Paragraph 7 of the Agreement entitles KCRG to a promotional schedule, which allows it to advertise and promote KCRG on various cable channels. *Id.* at ¶ 7. Paragraph 8 of the Agreement requires Mediacom to spend a certain amount of money advertising on KCRG. *Id.* at ¶ 8.

### D. Changes in the Industry

Since about 2001, commercial television stations have been transitioning from analog to digital television, so that many of them are now able to offer high-definition signals. In February of 2009, analog tele-

vision is scheduled to "go dark," or no longer be available in the United States.

Since 2001, cable companies have seen increased competition from two satellite providers, Direct TV and DISH Network. These satellite providers are now able to offer their customers "local to local," which means that they are able to provide KCRG's local signal directly to their customers.

Additionally, telephone companies are now beginning to offer video signals over fiber lines.

These changes impact KCRG, because Direct TV, DISH Network and the telephone companies are paying KCRG "per month per subscriber" fees. For example, cable and satellite customers pay between twenty cents and three dollars per subscriber for certain programming.

### E. Relevant Communications Between the Parties

On May 5, 2003, Belford sent Phelan a letter seeking to amend the Agreement. KCRG Trial Ex. 3; Mediacom Trial Ex. A–2.[6] The letter stated, in part:

> Since neither you nor TCI gave notice that you wanted to terminate the [A]greement within the time period stated in the contract, the contract automatically renewed at the end of the [I]nitial [T]erm. And since [Mediacom] agreed to assume the terms of the [A]greement, we have been living under that contract ever since. The expiration date of the contract is now December 31, 2007.

KCRG Trial Ex. 3; Mediacom Trial Ex. A–2. The amendments proposed in the May 5, 2003 letter included two topics: (1) changing the list of headends[7] to reflect the fact that Mediacom owned different systems than TCI had owned, and (2) increasing the number of promotional spots from thirty per month to fifty per month. The May 5, 2003 letter also addressed KCRG's concern about the emergency alert system ("EAS"), but Belford concluded that Mediacom was unable to change the EAS procedure at that time. Phelan accepted the amendments on behalf of KCRG.

On July 16, 2004, Belford sent Phelan another letter. KCRG Trial Ex. 4; Mediacom Trial Ex. A–3 & B. That letter reiterated that the "expiration date" of the Agreement was December 31, 2007. KCRG Trial Ex. 4; Mediacom Trial Ex. A–3 & B. The main point of the July 16, 2004 letter, though, was to "add a digital component" to the Agreement. KCRG Trial Ex. 4; Mediacom Trial Ex. A–3 & B. On August 3, 2005, Phelan agreed to the amendments set forth in the July 16, 2004 letter, and the parties added five new paragraphs to the Agreement. See KCRG Trial Ex. 5.

On September 29, 2005, Phelan sent approximately 160 notices of election by certified United States mail to the various companies that serve KCRG's DMA. KCRG elected must-carry status in the majority of the 160 election notices. KCRG only sent five notices in which it elected retransmission consent status. The retransmission consent elections went to Mediacom, Cedar Falls Utilities, McLeod Communications, Direct TV and Echo Star. KCRG chose to elect retrans-

---

**6.** The court notes that many of the parties' trial exhibits duplicate each other. For example, the same five-page letter was admitted as KCRG Trial Exhibit 4, Mediacom Trial Exhibit A–3 and Mediacom Trial Exhibit B.

**7.** The term "headend" is commonly used in the industry. It is the structure or equipment that a cable company has that receives television signals and satellite signals. The structure has wires going out from it to the individual homes to deliver the signals to the subscribers. In 2007, Mediacom's headends reach a much larger number of subscribers than they did previously, because Medicom has installed additional fiber lines.

mission consent status with these five companies, because the cable companies were able to give KCRG some benefits, including promotional schedules, a CNN News insert, a "guaranteed ad-buy" and a subscriber per month cash payment. *See generally* Mediacom Trial Ex. A, at ¶¶ 6, 7 & 8.

In the days leading up to the October 1, 2005 must-carry/retransmission consent election deadline, Belford received notices of election from about 758 commercial television stations.[8] About two-thirds of the 758 stations elect retransmission consent for at least part of their DMAs. In total, Belford and her assistant receive about 15,000 various elections. Belford personally reads each election notice, and she and her assistant enter them into a database.

One of the notices of election that Belford received via certified United States mail was a letter dated September 29, 2005, from Phelan to Mediacom ("2005 Letter"). KCRG Trial Exs. 6 & 7; Mediacom Trial Exs. C & D. The subject of the 2005 Letter is "Retransmission Consent" and it provides:

> This letter will notify you, pursuant to [47 U.S.C. § 325(b) ] and [47 C.F.R. § 76.64], that television station [KCRG] elects retransmission consent status on your cable systems detailed on Attachment "A" for the three-year election cycle commencing on January 1, 2006 and ending on December 31, 2008.
>
> As you know, your cable system currently carries [KCRG] pursuant to [the Agreement]. [The Agreement] is set to expire on December 31, 2007. Accordingly, in order to ensure that your cable subscribers continue to receive [KCRG], we look forward to having the opportunity to discuss with you mutually satisfactory terms under which [KCRG's] re-

transmission consent may be extended to your cable system upon the expiration of the current [A]greement.

KCRG Trial Ex. 6; Mediacom Trial Ex. C. The parties agree that the first paragraph of the 2005 Letter serves as KCRG's notice of election for the election cycle of 2006, 2007 and 2008, and they agree that KCRG elected retransmission consent status for that period. They also agree that the second paragraph of the 2005 Letter is unnecessary to effectuate election under 47 C.F.R. § 76.64.

Of the approximately 160 notices sent to cable companies by Phelan on September 29, 2005, only this 2005 Letter contained the second paragraph. Each of the other approximately 159 notices only contained the first paragraph. However, it is not uncommon for Belford to receive other information from commercial television stations in election notices, aside from the actual election itself.

### F. Communications in 2007

In 2007, Doug Frank became Mediacom's manager in Cedar Rapids. In May of 2007, Phelan invited Frank to lunch for two main reasons: (1) to introduce himself, and (2) to inform Frank that the Agreement was "off cycle" and that KCRG had given notice that it would expire on December 31, 2007. On May 9, 2007, the two had lunch at Biaggi's restaurant in Cedar Rapids, and Phelan learned that Frank was neither aware that the Agreement was off cycle nor that KCRG had given notice of its expiration. The two discussed negotiating the Agreement, but Frank advised Phelan to discuss negotiating the Agreement with Belford. Phelan never contacted Belford prior to July 23, 2007.

---

**8.** Belford testified once that 758 stations report to her, twice that 458 stations report to her and once that 768 stations report to her. Based on the testimony as a whole, the court finds that 758 is the accurate number.

On July 23, 2007, Phelan attempted to contact Belford to discuss the Agreement. On that date, they spoke on the telephone for about three minutes. Belford was not prepared to talk about the Agreement because she had not reviewed her KCRG file prior to the conversation. At that time, Belford informed Phelan that she did not recall receiving any notice from KCRG that it chose to terminate the Agreement. The two also briefly discussed the EAS procedure.

On July 24, 2007, Belford sent Phelan a letter via certified United States mail ("2007 Letter"). *See* Medicom Trial Ex. E. On July 27, 2007, Phelan received the 2007 Letter. *Id.* It provided, in part:

> Thank you for your telephone call yesterday. I have had the opportunity to review my file, and I note that paragraph 5 of the [Agreement] says:
>
>> The term of this Agreement shall commence on the date hereof and shall expire on December 31, 2001 (the "Initial Term"). This Agreement and the election set forth in Paragraph 1 hereof shall automatically renew ... provided, however, that either party may terminate this Agreement effective as of the end of the Initial Term or any Renewal Term upon six (6) months' prior written notice to the other party....
>
> Since neither party notified the other 6 months prior to the expiration of the Initial Term that they wished to terminate the [A]greement, the [A]greement automatically renewed for a Renewal Term that is to expire on December 31, 2007. However, if one of us wished to terminate the [A]greement in its entire-

ty as of December 31, 2007, we would have had to provide written notice to the other before June 30, 2007. I have not sent such notice to you, and to the best of my knowledge, we have received no such written notice from you. Absent such notices, the [A]greement will again automatically renew, and the new termination date will be December 31, 2013. If your records show otherwise, please let me know.

Mediacom Trial Ex. E. After sending the 2007 Letter, Belford received no written response from Phelan.[9] Until the time the lawsuit was filed on October 31, 2007, Belford was not aware that Phelan was relying on the 2005 Letter as KCRG's notice of termination.

On Friday, July 27, 2007, Phelan attempted to reach Belford by telephone, with no success. On Monday, July 30, 2007, Phelan reached Belford by telephone, but she did not have enough time to speak with him. The two scheduled a telephone meeting for August 1, 2007, at 1:00 p.m. On August 1, 2007, Phelan was prepared to meet telephonically, called Belford at 1:11 p.m. and Belford did not answer. She did, however, return his telephone messages with no success. On August 10, 2007, Phelan attempted to call Belford a final time, but he had no success. At that time, Phelan contacted an FCC attorney and, on October 31, 2007, commenced the instant lawsuit.

## IV. CONCLUSIONS OF LAW

### A. Parties' Arguments

Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, KCRG

---

9. During the bench trial on November 16, 2007, Belford remained steadfast in her position that Mediacom had not received a notice of termination of the Agreement from KCRG prior to June 30, 2007. She testified that it would have been premature to send notice of termination of the Agreement in September of 2005 and the 2005 Letter did not contain words of termination. At trial, Phelan insisted that the 2005 Letter served as KCRG's notice of termination and complied with paragraph 5 of the Agreement.

seeks a declaratory judgment that its notice in the 2005 Letter was sufficient to terminate the Agreement on December 31, 2007. Mediacom asks that declaratory judgment be entered establishing that the Agreement automatically renews on December 31, 2007, and continues in effect until December 31, 2013.

KCRG argues that the language in the second paragraph of the 2005 Letter was adequate, because

> [t]he Agreement does not establish an outside limit to how early the notice can be provided. Nor does the parties' Agreement require the use of any specific language *or* that the notice of termination be in a writing devoted solely to that purpose. In other words, the Agreement in no way precluded KCRG from providing the notice of termination in the same document as KCRG's three year election notice.

KCRG's Trial Brief (docket no. 8), at 6–7 (emphasis in original). KCRG argues that, because the 2005 Letter was in writing and mailed via certified United States mail, it was in compliance with paragraph 5 of the Agreement. KCRG urges that the court must not require certain language, a separate notice or a notice closer in time than September of 2005, because "[t]hat is not what the Agreement requires." *Id.* at 7.

Mediacom argues that the 2005 Letter "by its terms was inadequate to serve as notice of [KCRG's] alleged determination, more than two years in advance, to end its existing contractual relationship with Mediacom effective December 31, 2007." Mediacom's Trial Brief (docket no. 7), at 5. Mediacom argues that the law requires strict compliance with paragraph 5 of the Agreement, that is, the law requires the notice of termination to be "clear, definite, unambiguous and unequivocal." *Id.* at 5–6. It argues that the second paragraph of the 2005 Letter does not "clearly and un-ambiguously convey an unequivocal intent by [KCRG] to exercise its contractual right of termination." *Id.* at 6.

The parties agree that paragraph 5 of the Agreement requires notice of termination by June 30, 2007, otherwise the Agreement will automatically renew for another six-year term. In other words, the parties agree that, if either party failed to take affirmative action to notify the other of termination by June 30, 2007, then the Agreement remains in place until December 31, 2013.

### B. Analysis

#### 1. Applicable law

■ A federal court sitting in diversity must apply the substantive law of the state in which the cause of action arose. *See generally Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (determining that federal courts whose jurisdiction is based solely on diversity must apply state, rather than federal, substantive law in order to prevent parties from forum shopping); *see also White Consol. Indus., Inc. v. McGill Mfg. Co.,* 165 F.3d 1185, 1187 (8th Cir.1999) (stating that, because it was a diversity case, Minnesota law controlled "the substantive issues"). Therefore, the court will apply Iowa law to this contract dispute.

#### 2. Declaratory Judgment Act

The Declaratory Judgment Act provides, in part:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment

or decree and shall be reviewable as such. 28 U.S.C. § 2201(a). It also provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." *Id.* § 2202.

### 3. Adequacy of 2005 Letter

■■■ A notice "is subject to construction as any other written contract." *Brecht v. Cedar Rapids Dev. Co.,* 257 Iowa 1117, 136 N.W.2d 287, 291 (Iowa 1965). "[A] notice of termination must be 'clear, definite, unambiguous and unequivocal, and it properly may not be so characterized unless its meaning can be apprehended without explanation or argument' in order to be effective." *Gray v. Bicknell,* 86 F.3d 1472, 1479 (8th Cir.1996) (applying Missouri law and quoting *Baker v. Mo. Nat'l Life Ins. Co.,* 372 S.W.2d 147, 152 (Mo.Ct.App.1963)); *see also Brecht,* 136 N.W.2d at 291 ("Where the language used is plain and unambiguous the intent of the parties is determined by what the contract says."); 17B C.J.S. *Contracts* § 446 (Online ed. 2007) ("A clear and unambiguous notice, timely given, and in the form prescribed by the contract, is essential to the exercise of an option to terminate the contract."). As a general proposition, "if a party who has the power of termination fails to give notice in the form and the time required by his reservation, it is ineffective as a termination." A.L. Corbin, 6 *Corbin on Contracts,* § 1266, 64 (1962). "The essence of notice, when it is sufficient in form and content, is its objective effect on the person to whom it is given, not the subjective intent of the person who gives it." 58 Am.Jur.2d *Notice* § 2, at 572–73

(Online ed.2007) (footnote omitted). "[I]n the context of contractual relations, notice allows the party notified to contemplate, and to prepare for, an action that will occur." *Gray v. Am. Express Co.,* 743 F.2d 10, 17 (D.C.Cir.1984).

Although there is a dearth of Iowa case law regarding notices of termination, the case of *Laverty v. Hawkeye Security Insurance Co.,* 258 Iowa 717, 140 N.W.2d 83 (Iowa 1966), is instructive. In *Laverty,* a farmer purchased automobile insurance, as well as two other types of insurance, through the Stoker Agency, and the automobile insurance policy's renewal date was June 8, 1963. *Id.* at 84–85. The Iowa Supreme Court stated: "For some reason not appearing in the record[,] it was the custom of the [Stoker Agency] to keep the policies," therefore, the farmer "had never seen nor had physical possession of any of his policies." *Id.* at 85. On May 24, 1963, Mr. Stoker of the Stoker Agency wrote the farmer a letter with the subject "Policy No. 7235733." *Id.* The letter stated:

> Your policy expires 6/8/63. Please take out your insurance with an agent in your own local area as we think this would help you in claim work by having a closer agent.
>
> Thanks a lot Carl. Please let me know when you have done this so you won't be charged for a new policy.

*Id.* In the context of discussing a custom of belated collections of policy premiums and automatic renewals,[10] the Iowa Supreme Court concluded:

> The letter of May 24, 1963 was not a notice of termination of the custom as to renewal. It was a request for a change for [the farmer's] convenience and it clearly indicated that unless [the farmer]

---

10. The Stoker Agency collected the farmer's premiums "by charging [the farmer's] bank account with a debit slip when [the farmer] happened to have sufficient money therein."

140 N.W.2d at 85. The payment "did not always coincide with the due date of the premiums." *Id.*

made the change he would be charged for a renewal at the Stoker [A]gency. *There was no expression of a definite intent to cancel or terminate* and not even an adequate identification of the policy. There was a policy number on the letter but neither the name of the company nor the kind of insurance was shown....

The trial court found that the [May 24, 1963 letter] from [Mr. Stoker] to [the farmer] was not a notice of cancellation. We agree.

*Id.* at 87 (italics added). Therefore, the question here is whether, on the face of the 2005 Letter, the court can find an expression of a definite intent to terminate the Agreement.

 The court acknowledges that there are no magic words that need to be included in a notice of termination in order for it to be sufficiently clear to terminate a contract. *See Gray*, 86 F.3d at 1479 (applying Missouri law and determining that a letter provided satisfactory notice of breach even though it did not use the words "breach" or "termination" and even though adding such words to the letter would have constructed a "clearer notice of breach"); *see also Paterson Parchment Paper Co. v. Int'l Bhd. of Paper Makers*, 191 F.2d 252, 254 (3d Cir.1951) (holding that a letter from a union was effective as a termination letter although it did not use the word "terminate"). However, in order to terminate an agreement that contains a right of termination, the party intending to terminate must strictly comply with the terms and conditions contained in the agreement. *R & B Appliance Parts, Inc. v. Amana Co., L.P.*, 258 F.3d 783, 786 (8th Cir.2001) (applying Iowa law and citing *Artificial Ice Co. v. Reciprocal Exch.*, 192 Iowa 1133, 184 N.W. 756, 759 (Iowa 1921)). Additionally, the words used in a written instrument must be construed against the drafter. *Johnson Controls, Inc. v. City of Cedar Rapids*, 713 F.2d 370, 375 (8th Cir. 1983) (applying Iowa law and stating that any ambiguity in the contract "must be resolved against the drafter of the contract").

Here, there were no "terms and conditions" to follow, other than a time limit and the requirement that the notice be in writing. *See* Medicom Trial Ex. A, at ¶ 5 ("[E]ither party may terminate this Agreement effective as of the end of ... any Renewal Term upon six (6) months' prior written notice to the other party...."). *Cf. R & B Appliance Parts*, 258 F.3d at 786 (holding that, because no notice was sent and the contract in question provided that it could only be "terminated by means of a written notice sent by certified mail," it was "plain as a matter of law that the agreement was not terminated"). Although certain language, like the word "terminate," is not required, the words used by KCRG in the second paragraph of the 2005 Letter are not clear or definite. It is clear that KCRG wanted to discuss the Agreement and possibly amend it, but it was not clear that KCRG was invoking its power to terminate pursuant to paragraph 5 of the Agreement. *Cf. Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir.2004) (applying Minnesota law, determining that the defendant terminated the contract and stating that, "[a]fter reciting that [a certain paragraph of the contract] gave 3M the right to terminate immediately, 3M's [letter] unambiguously stated: 'Such notice of immediate termination of [the contract] is hereby given' "). In fact, the letter states nearly the opposite of an intent to terminate the Agreement—it states that KCRG was anticipating a long-term relationship with Mediacom. *See* KCRG Trial Ex. 6 ("[W]e look forward to having the opportunity to discuss with you mutually satisfactory terms under which [KCRG's] retransmission consent may be

extended. . . ."); Mediacom Trial Ex. C (same).

The court concludes that KCRG is bound by the automatic renewal language in paragraph 5 of the Agreement. *See Cedar Valley Corp. v. NLRB,* 977 F.2d 1211, 1220 (8th Cir.1992) ("[The plaintiff], having signed an agreement that clearly obligated it to affirmatively and formally terminate [the agreement] at least sixty days prior to renewal, cannot fail to so terminate and then complain of enforcement."). Because its 2005 Letter was not clear, definite or unequivocal, the court finds that it was not a notice of termination of the Agreement. Therefore, pursuant to the terms of the Agreement, it automatically renews at the end of 2007 and is effective through December 31, 2013.

### V. JUDGMENT

For the foregoing reasons, it is hereby **ORDERED:**

(1) The court **GRANTS DECLARATORY JUDGMENT** in favor of **MEDIACOM** on KCRG's Complaint (docket no. 2);

(2) KCRG failed to give adequate notice of termination pursuant to paragraph 5 of the Agreement, therefore the Agreement automatically renews and is effective through December 31, 2013;

(3) The Clerk of Court is directed to **ENTER JUDGMENT** in favor of Mediacom; and

(4) KCRG is directed to bear Mediacom's costs.

**IT IS SO ORDERED.**