IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DC FARMS, LLC, an Idaho limited liability company, | ) ) ) | No. 30963-1-III |
| Appellant, | ) ) ) | |
| v. | ) ) | |
| CONAGRA FOODS LAMB WESTON, INC., a Delaware corporation doing business in Washington State, | ) ) ) ) | PUBLISHED OPINION |
| Respondent. | ) ) | |

SIDDOWAY, A.C.J. — The trial court resolved this contract dispute on summary judgment, concluding that a food processor was excused from providing a contractually required notice of default and opportunity to cure because a farmer's breach was incurable. This was error. The processor was required to honor the notice-and-cure provision despite its belief that the breach could not be cured. It could and did seek summary judgment that the farmer suffered no damage because it was incapable of curing the breach, but a genuine issue of fact exists as to whether the farmer remained able to substantially perform.

We reverse the trial court's dismissal of the farmer's claims and remand for entry

of partial summary judgment in the farmer's favor and trial of the remaining issues.

## FACTS AND PROCEDURAL BACKGROUND

DC Farms LLC grows potatoes and other crops in and around Blackfoot, Idaho.

Conagra Foods Lamb Weston Inc. is a processor of frozen potato products with offices in

Benton County. This appeal arises out of DC Farms's action for breach of contract and

related claims brought after Lamb Weston claimed to terminate and then refused to

perform under a "Strategic Potato Supply Agreement" entered into between the parties.

The Strategic Potato Supply Agreement created what representatives of both

parties referred to as a "joint venture" or "joint venture partnership" between the two.[1]

---

[1] Lamb Weston disputes the existence of a joint venture (JV) relationship tantamount to a partnership. Here, we merely recognize that Lamb Weston's representatives, like DC Farms's, characterized the parties' arrangement as a joint venture. *See* Clerk's Papers (CP) at 219 (deposition of Tommy Brown, Lamb Weston Manager of Ag Operations, testifying to how DC Farms, "part of our grower group," was invited in 2009 to "becom[e] a joint venture," and how "we sat down and discussed how the joint venture partnership worked"); CP at 240-41 (deposition of David Smith, Lamb Weston Senior Director of Ag Services, describing the agreement with DC Farms as "pretty much our standard format for partnership agreements" and explaining the reason for providing a relatively late notice of nonrenewal date in the DC Farms agreement as being to "'give us more time to determine if we want to continue with this JV'"); CP at 177 (internal foreign material report, stating that broken light bulb "was determined to have come from storage 986 Joint Venture DC Farms"); CP at 185 (foreign material found summary, similarly referring to "storage 986 Joint Venture DC Farms"); CP at 182 (internal electronic mail identifying individuals who will "need to work through the issue and determine how it impacts the JV"). DC Farms's assignments of error do not require us to express any conclusions about the legal character of the relationship.

2

This is one of three types of contracts that Lamb Weston representatives testified to using to acquire potatoes for processing, the others being "grower storage" and "field delivery" contracts. Clerk's Papers (CP) at 223. Lamb Weston executives testified that among characteristics they look for before offering a joint venture arrangement to a farmer is whether the farmer owns or controls ground, whether the farmer has "[t]he ability to farm and basically a proven record of some sort that they can grow potatoes," whether there is "a definite interest on [the farmer's] part to go into a partnership arrangement," and the presence of "[s]uccession," meaning that a farmer can be expected to be in the business for a long period of time. CP at 237-38.

Under Lamb Weston's joint venture arrangement, the farmer commits to growing potatoes on some of his or her farm ground with the specific acreage designated by the agreement, and to grow the crop under Lamb Weston's specifications and supervision as to some matters and under comanagement as to others. The farmer benefits by, among other things, having a solid buyer who is contractually obligated to pay expenses, purchase the potatoes according to a set schedule, and split the profits. Lamb Weston benefits by, among other things, locking in a source of supply that is grown under its preferred farming practices.

The DC Farms-Lamb Weston agreement was entered into in February 2009 and designated 1,300 acres of farm ground owned by DC Farms to be farmed for the joint venture. The agreement covered the 2009 crop year and provided for automatic renewal

3

for crop years thereafter, subject to Lamb Weston's right to serve a notice of nonrenewal by the October 1 preceding the next crop year.

Lamb Weston exercised its supervisory or comanagement authority over cultivation of the 2009 crop, providing or participating in direction on farming techniques, fertilizer application, harvest time and order, and storage requirements. Before harvest, Lamb Weston inspected the eight cellars that would be used to store the joint venture potatoes, identified any action it required to be taken before the cellars could be used, and then, according to DC Farms, required DC Farms to seal the cellars until harvest. According to David Cooper, one of the two managing members of DC Farms (his brother-in-law, Doug Case, is the other), he and Mr. Case "didn't always agree with [Lamb Weston's] instruction, and following the instruction cost DC time and financial loss, but DC complied." CP at 118. DC Farms's employees harvested the 2009 crop and unloaded the potatoes into the eight cellars inspected and approved by Lamb Weston.

On October 23, Lamb Weston's employees began removing potatoes from the cellars for delivery to Lamb Weston's plant. Two days into the work, Lamb Weston was notified by its transport contractor that its hog operator[2] had found a broken light bulb in

---

[2] Lamb Weston's reference to the "hog," "hog operator," and "hogging" are evidently to the operation of equipment that combines a driver-operated scoop with a piler and is used to load potatoes from storage into trucks.

4

DC Farms's cellar 7 while filling a truck with potatoes. At Lamb Weston's instruction, DC Farms's employees removed three or four truckloads of potatoes from cellar 7 and disposed of them in the corner of a field, due to the risk they had been contaminated with glass.

Two days later, a Lamb Weston employee working a potato processing line at Lamb Weston's facilities reported finding what he first thought was a plastic bag on the line; it turned out to be a broken light bulb within a Tuff-Skin membrane. Farmers generally use light bulbs covered in a membrane called Tuff-Skin in potato storage areas, since the membrane will contain pieces of glass in the event the bulb breaks. Lamb Weston employees had noted that DC Farms used Tuff-Skin bulbs when they originally inspected and approved its cellars.

Having discovered the Tuff-Skin sack, Lamb Weston tracked and then disposed of all potatoes then on its processing line. No other glass was found in the potatoes then being processed. Lamb Weston was able to determine that the Tuff-Skin sack discovered on the processing line came from the same cellar at DC Farms—cellar 7—where the broken light bulb had been found two days earlier.

The next day, Lamb Weston sent two employees, Todd McBride and Tommy Brown, to conduct a several-hour inspection of the eight cellars in which the joint venture potatoes grown by DC Farms were stored. Mr. McBride and Mr. Brown were

5

accompanied during the inspection by Mr. Case. The parties have markedly different versions of what was learned during that inspection.

Mr. McBride's internal Lamb Weston report, prepared immediately after the inspection, included a map of the light fixtures in each of the eight cellars, showing that a total of 30 light bulbs were broken or missing from five of the eight cellars. His report stated that he and Mr. Brown had "discovered the root cause of broken light bulbs in the DC Farms storages," explaining:

> David Cooper, questioned separately two piler operators who filled the storages. Both piler operators stated that, one of the pipe layers was throwing potatoes which were breaking lights during the filling process.

CP at 474. Mr. Brown's internal report stated that the act "enabled . . . broken light bulbs to detach from element and tumble into the potato pile" and that despite their Tuff-Skin membranes, "[o]nce the plastic wrap detaches from the element there is a hole the size of standard light bulb element exposed, allowing glass particles to escape." *Id.* He reported that he, Mr. Brown, and Mr. Case "noted potato matter on several of the lighting fixtures" in the cellars, confirming the report of intentional postharvest breakage. *Id.* He reported as further confirmation that he had reviewed storage inspection forms for each cellar and "there were no reported missing or broken lights during pre-harvest inspections." *Id.* His report concluded, "It is highly likely that glass fragments are present below light fixtures and spread toward the piler (storage entrance) at each of the broken fixture locations." *Id.*

6

For their part, Mr. Cooper and Mr. Case deny that information obtained from the inspection supports Mr. McBride's internal report. They claim that the broken or missing light bulbs counted and mapped by Mr. McBride and Mr. Brown had, to the best of their knowledge, been broken or missing before harvest and even before Lamb Weston's inspection and approval of the cellars. Mr. Cooper and Mr. Case both testified that replacement bulbs had been ordered and were supposed to be installed before harvest, but were not installed because Lamb Weston directed them to stay out of the cellars following inspection. Mr. Case claims that in the inspection following discovery of the broken bulb in cellar 7, he spoke with Mr. McBride and Mr. Brown about the fact that the breakage observed might not be new and Mr. McBride even took several broken light bulb bases with DC Farms's permission, representing that Lamb Weston would inspect them to determine whether the breaks were new or old.

As to the alleged malicious mischief by DC Farms employees, Mr. Cooper contends he never told anyone that DC Farms's employees admitted breaking lights by throwing potatoes at them. He testified that he spoke with the three employees responsible for unloading the joint venture potatoes into the eight cellars and each denied any intentional breaking of lights. Two stated that they might have inadvertently broken lights with their backs or the piler but that they cleaned up any broken glass, as required by work rules. Those two employees added that "if anyone was throwing potatoes" it would have been the third employee, Emmanuel Granados, CP at 119, prompting Mr.

7

Cooper to speak again with Mr. Granados, who again denied throwing any potatoes at light fixtures. Mr. Cooper contends that all he reported to Mr. Case was the speculation of the two employees, denied by Mr. Granados, and Mr. Case contends that this is what he repeated to Mr. McBride or Mr. Brown. Mr. Case and Mr. Cooper contend (and Mr. McBride agrees, although Mr. Brown does not) that Mr. Cooper never spoke directly to Mr. McBride or Mr. Brown about what he was told by the employees.

Mr. Case contends that while accompanying Mr. McBride and Mr. Brown on their inspection, they saw what Mr. McBride would later characterize as potato matter on some of the light fixtures. But according to Mr. Case, while he and the Lamb Weston representatives assumed that what they saw on the fixtures was or might be potato matter, "it was impossible to tell if the matter was from a potato, dirt, or something else," "[t]here was also no way to determine how long the matter had been on the fixture," and Mr. McBride and Mr. Brown did not take any samples of the matter. CP at 625.

Following the inspection, all removal and processing of the joint venture crop was put on hold by Lamb Weston. Several weeks later, in mid-November, Lamb Weston representatives met with Mr. Cooper and Mr. Case and told them the remaining joint venture potatoes would not be processed and that Lamb Weston was terminating the parties' agreement. On November 19, Lamb Weston representatives delivered an undated letter formally notifying DC Farms that it was "exercis[ing] its rights . . . to terminate [the] agreement," "due to DC Farms' negligence and/or misconduct in the

8

supervision and storage of potatoes in the DC Farms potato storage sheds, which resulted in pervasive glass contamination and other potential issues." CP at 41. It also notified DC Farms that it had incurred financial losses for which it expected to be compensated by DC Farms.

Despite Lamb Weston's informal and formal notice of termination, DC Farms sought to preserve the relationship, offering to run all the joint venture potatoes through additional inspections or to substitute potatoes from its other operations. Lamb Weston rejected both proposals.

Although Lamb Weston had not served notice of nonrenewal of the parties' agreement before October 1, it refused to recognize any joint venture arrangement for DC Farms's 2010 crop. It refused to pay DC Farms's operating loan from U.S. Bank and refused to pay outstanding crop expenses for the 2009 season, both of which DC Farms contends were required by the parties' agreement. In February 2010, it did make a $243,860.54 payment, representing the $345,142.33 price for potatoes delivered before termination of the agreement, reduced by a $101,281.79 offset documented as the downtime of its processing line after the Tuff-Skin from cellar 7 was discovered.

In March 2011, DC Farms filed the action below, seeking damages for breach of contract, duties of good faith and fair dealing, and fiduciary duty. Its principal contention was that Lamb Weston failed to comply with the termination provision of the parties'

9

contract, which provided for written notice of any default and a seven-day period for cure. It asserted that it could have cured the defect in its performance.

*Postlawsuit Evidence*

In the course of discovery, DC Farms obtained evidence that Lamb Weston had contracted for more potatoes from the 2009 potato crop than it could use, and that because the market price for potatoes dropped below the price set by Lamb Weston's price schedule for its contracts with growers, it had been looking for ways to refuse to honor contracts and thereby limit its losses from excess potatoes. DC Farms discovered internal Lamb Weston e-mails suggesting that as early as August and September 2009 Lamb Weston had considered selling excess potatoes to a dehydration plant such as Nonpareil, to whom DC Farms ultimately sold most of its potatoes after Lamb Weston refused to accept them. In the spring of 2010, when Lamb Weston was in need of potatoes, it purchased DC Farms's potatoes from the three cellars in which Lamb Weston representatives had seen no broken or missing light bulbs, a fact that DC Farms points to as evidence of the processor's bad faith in earlier refusing to accept those potatoes under the joint venture agreement.

For its part, Lamb Weston obtained information during discovery on two insurance claims and a criminal complaint filed by DC Farms or its affiliates in connection with its financial losses resulting from the broken bulbs. Documents obtained by Lamb Weston in discovery included a police incident report and insurance claim

10

records that it characterizes as admissions by DC Farms that Mr. Granados had indeed broken lights in four of the cellars, that "light bulbs were falling down into the pile of potatoes," and that it had "[d]amaged potatoes from glass shards." CP at 480, 486. In deposing Mr. Case, they obtained his concession that he initially believed it might be true that Mr. Granados had intentionally thrown potatoes at light fixtures, causing breakage, and that he had passed along that explanation in seeking insurance coverage after Lamb Weston notified him and Mr. Cooper that it was terminating the parties' agreement.

Both parties engaged industry experts. Dr. Richard Dougherty, a food safety expert engaged by Lamb Weston, expressed his opinion that glass in any food product is "'adulterated,'" is potentially injurious to health, that "[t]here would be no way visual inspections could guarantee the absence of imbedded glass particles" in raw potatoes, and that Lamb Weston therefore properly refused to accept raw potatoes from the storage facilities owned by DC Farms. CP at 346, 347.

Gary Farmer, an agronomist engaged by DC Farms, testified that because lighting in a cellar is not critical, growers ordinarily wait to replace burned out, missing, or broken light bulbs "until it becomes an absolute necessity," and that "[c]ellars with multiple burned out, missing, or broken light bulbs is much more common than a cellar with all its light bulbs present and working." CP at 95. Attachments to his declaration included photographs of compromised light bulbs in cellars other than DC Farms's that were used to store potatoes for Lamb Weston in and before 2010. DC Farms also submitted

11

declarations from four farmers who testified that they had sold potatoes to Lamb Weston; that it was common for light bulbs in potato cellars to be burned out, missing, or broken; and that Lamb Weston representatives had never required them to replace such bulbs before storing contract potatoes. Three of the farmers testified that Lamb Weston had inspected their cellars, whose fixtures either did have or could have contained burned out, broken, and missing light bulbs, and had approved their cellars for potato storage.

Dr. Robert Thornton, a crop consultant engaged by DC Farms, prepared a report in which he concluded that Lamb Weston did not respond to the glass incident in a typical fashion, that it did not exercise reasonable judgment in working with DC Farms, that its reports before and after the glass incident were inadequate to determine the risk of further glass contamination, that it was reasonable for DC Farms to offer replacement potatoes to Lamb Weston, and that market conditions during the 2009 potato growing and storage season influenced Lamb Weston's response to the glass incident.

In April 2012, the parties filed cross motions for summary judgment or partial summary judgment. DC Farms sought partial summary judgment on four liability issues. Lamb Weston sought summary judgment dismissing DC Farms's complaint.

The trial court denied DC Farms's motion and granted Lamb Weston's, dismissing DC Farms's complaint in its entirety. DC Farms appeals.

12

ANALYSIS

DC Farms makes three assignments of error. It argues, first, that the trial court erred in denying its motion for partial summary judgment on Lamb Weston's breach of the termination provision requiring written notice of default and a seven-day opportunity to cure; second, that the trial court erred in granting Lamb Weston's motion for summary judgment because DC Farms's ability to cure its defective performance presented an issue of disputed fact; and third, that the trial court erred in dismissing the case in its entirety because Lamb Weston's motion for summary judgment addressed only some of its claims of breach and damage, and others, not addressed by Lamb Weston's motion, remained viable.

We review an order of summary judgment de novo, considering the facts and reasonable inferences in the light most favorable to the nonmoving party. *Beggs v. Dep't of Soc. & Health Servs.*, 171 Wn.2d 69, 75, 247 P.3d 421 (2011). Summary judgment is proper if the pleadings and accompanying documentary evidence show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Phillips v. King County*, 136 Wn.2d 946, 956, 968 P.2d 871 (1998); CR 56(c).

Having reviewed the record with these standards in mind, we agree with DC Farms's first two assignments of error, reverse the trial court on those counts, and

13

therefore need not reach the third assignment of error. We address DC Farms's first two assignments of error in turn.

I.    *Lamb Weston breached section 7.2 of the parties' agreement by failing to provide a notice of default and opportunity to cure.*

Section 7.2 of the parties' agreement, captioned "Default, Remedies and Termination," includes the following language relevant to Lamb Weston's purported termination of the parties' agreement:

> Default by [DC Farms]: Any of the following events *that remain uncured after receipt of seven (7) days written notice of default, which notice shall describe the nature of the default,* shall be considered a material breach and default by [DC Farms]:
>
> . . . .
>
> (c) The negligence or misconduct of [DC Farms], its employees or agents resulting in the loss of, or damage to, a material portion of the Crop.
>
> . . . .
>
> 7.2.2 [Lamb Weston]'s Remedies.
> Upon any event of default . . . [Lamb Weston], in addition to any other remedy afforded it by law or by this Agreement:
> (a) May terminate this Agreement and may hire a farmer to fulfill [DC Farms]'s obligations under this Agreement or take such other measures as [Lamb Weston] deems are in its best interest to preserve and protect the Crop and [Lamb Weston]'s rights hereunder.

CP at 15-16 (emphasis added).

Lamb Weston's undated letter delivered to DC Farms on November 19 did not provide a notice of default. It stated instead that DC Farms should "take this [letter] as notice that [Lamb Weston] hereby exercises its rights, pursuant to Section 7.2(c) of our Strategic Potato Supply Agreement dated January 29, 2009, *to terminate that agreement*

14

with DC Farms for breach." CP at 41 (emphasis added). It went on to say that "as a result of the limited amount of potatoes that were actually delivered to our plants and processed prior to the discovery of the glass contamination, we have incurred financial losses and we expect DC Farms to fully compensate us for these losses." *Id.*

Lamb Weston contends it was not required to provide DC Farms with a notice of default and seven-day opportunity to cure because DC Farms's breach was incurable and Washington law "'does not require someone to do a useless act.'" Br. of Resp't at 13 (quoting *Moratti v. Farmers Ins. Co. of Wash.*, 162 Wn. App. 495, 504-05, 254 P.3d 939 (2011) (citing *Willener v. Sweeting*, 107 Wn.2d 388, 395, 730 P.2d 45 (1986))). It acknowledges that no Washington case has applied the common law maxim excusing useless acts to a contractual notice-and-cure provision that, by its terms, requires a notice of default. It asks us to adopt the reasoning of *Stacey v. Redford*, 226 S.W.3d 913, 918 (Mo. Ct. App. 2007) that service of an otherwise-required notice of default is excused if the breach at issue is incurable. Before considering this authority from another jurisdiction, we review relevant contract principles.

### A. General Contract Principles

The general rule with respect to compliance with the terms of a bilateral contract is not strict compliance, but substantial compliance. 15 RICHARD A. LORD & SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 44:52, at 217 (4th ed. 2000). The doctrine of substantial performance is intended for the protection and relief of those who

15

have faithfully endeavored to perform their contract in all material and substantial particulars, so that their right to compensation may not be forfeited by, e.g., inadvertent omissions or defects. *Donald W. Lyle, Inc. v. Heidner & Co.*, 45 Wn.2d 806, 812, 278 P.2d 650 (1954). Although a plaintiff who has substantially performed a contract may maintain an action on the contract, the action is without prejudice to any showing of damage on the part of the defendant for the failure to receive a full and complete performance. 15 LORD & WILLISTON, *supra*, § 44:52, at 222-23.

Substantial performance is said to be the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused. *Id.* § 44:55, at 231-32; 25 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 10:6, at 274-75 (2d ed. 2007) (citing JOHN D. CALAMARI & JOSEPH M. PERILLO, LAW OF CONTRACTS § 11-18, at 433 (5th ed. 2003); *Mortimer v. Dirks*, 57 Wash. 402, 107 P. 184 (1910)). Only a breach or nonperformance of a promise by one party to a bilateral contract so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty. *Jacks v. Blazer*, 39 Wn.2d 277, 285-86, 235 P.2d 187 (1951).

The materiality of a breach, and thereby the issue of substantial performance, is a question of fact. *Bailie Commc'ns, Ltd. v. Trend Bus. Sys.*, 53 Wn. App. 77, 765 P.2d 339 (1988) (addressing material breach); *accord TMT Bear Creek Shopping Ctr., Inc. v.*

16

*PETCO Animal Supplies, Inc.*, 140 Wn. App. 191, 209, 165 P.3d 1271 (2007). The

question of materiality depends on the circumstances of each particular case. *Vacova Co.*

*v. Farrell*, 62 Wn. App. 386, 814 P.2d 255 (1991). In *Bailie*, 53 Wn. App. at 83, the

court cited and applied the criteria identified in *Restatement (Second) of Contracts* § 241

(1981), which provides that

> [i]n determining whether a failure to render or to offer performance is
> material, the following circumstances are significant:
> (a) the extent to which the injured party will be deprived of the
> benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately
> compensated for the part of that benefit of which he will be
> deprived;
> (c) the extent to which the party failing to perform or to offer to
> perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to
> perform will cure his failure, taking account of all the circumstances
> including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or
> to offer to perform comports with standards of good faith and fair
> dealing.

While the general rule is that a party who has substantially performed may

maintain an action on a contract, parties may contract for literal performance. Where the

parties have not made it clear that literal and exact compliance is necessary, however,

substantial performance will suffice, especially if requiring literal performance will result

in a forfeiture. 15 LORD & WILLISTON, *supra*, § 44:53, at 224-25.

Parties may, and here the parties did, provide that a party who breaches is entitled

to notice and an opportunity to cure. Lamb Weston's joint venture agreement entered

17

into by DC Farms does not define the term "cure." Washington courts have construed "cure" as used in article 2 of the Uniform Commercial Code (codified in Washington at chapter 62A.2 RCW), which does not define the term, as designed to "place the nonbreaching party in the same position as he would have occupied had no breach occurred." *Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*, 21 Wn. App. 194, 198, 584 P.2d 968 (1978). Other jurisdictions have held that "[t]he common meaning of 'cure' is to remedy, restore, remove, or rectify . . . and as the term relates to defaults, 'cure' means to restore matters to the *status quo ante*." *In re Matter of Clark*, 738 F.2d 869, 872 (7th Cir. 1984).

Where the parties' contract includes a notice-and-cure provision, generally, "'[a] clear and unambiguous notice, timely given, and in the form prescribed by the contract is essential to the exercise of an option to terminate the contract.'" *Cedar Rapids Television Co. v. MCC Iowa LLC*, 524 F. Supp. 2d 1127, 1136 (N.D. Iowa 2007) (quoting 17B C.J.S. *Contracts* § 446 (Online ed. 2007)), *aff'd*, 560 F.3d 734 (8th Cir. 2009). "As a general proposition, 'if a party who has the power of termination fails to give notice in the form and the time required by his reservation, it is ineffective as a termination.'" *Id.* (quoting 6 A.L. CORBIN, CORBIN ON CONTRACTS § 1266, at 64 (1962)). In *Filmline (Cross-Country) Productions, Inc. v. United Artists Corporation*, 865 F.2d 513, 518 (2d Cir. 1989), a purported notice of termination was found ineffective under New York law where United Artists "made no effort to comply with the explicit

18

requirement . . . that Filmline was to be accorded an opportunity 'to cure, correct or remedy such breach or default within thirty days of written notice specifying same.'"

### B. The "Useless Act" Maxim as Applied To Notice-And-Cure Provisions

The common law maxim that "the law does not require the performance of an idle or useless act," which Lamb Weston asks us to apply to excuse its failure to comply with the notice-and-cure provision, is one of long-standing. It has been applied in a number of contexts arising in contract cases. Lamb Weston cites *Willener*, which, in dicta, recognizes that the maxim can excuse contractual performance where a contra-party cannot or will not perform a condition precedent. 107 Wn.2d at 395. It cites *Music v. United Insurance Company of America*, 59 Wn.2d 765, 768-69, 370 P.2d 603 (1962), which holds that the condition to coverage under a disability insurance policy that a claimant be under the regular attendance of a physician cannot reasonably apply to a claimant whose disability is permanent and admits of no further treatment. The maxim was also applied in *Sutthoff v. Maruca*, 57 Wash. 102, 104, 106 P. 632 (1910) to excuse a purchaser's tender of the purchase price for property on the date provided for performance where undisputed evidence at trial established that the seller could not convey good title as required.

Washington courts have explicitly refused to apply the maxim to excuse a party from providing a notice of default required by a notice-and-cure provision, however.

19

In *Republic Investment Company v. Naches Hotel Co.*, 190 Wash. 176, 67 P.2d 858 (1937), the appellate court held that a lessor's cause of action to terminate a lease would not accrue until it complied with its contractual obligation to give notice and an opportunity for the lessee to cure. In response to the lessor's argument "that it was relieved of giving the notice provided for in the lease, because it was not required to do a useless thing—this on the theory that it was not possible for the lessee to fulfill [the covenant alleged to have been breached]," the court said:

> In support of this contention, a number of cases are cited to the effect that where the lessee has so breached a covenant as to make reinstatement impossible, failure of the lessor to give notice of forfeiture as required by the lease will not defeat the action. *We are inclined to the view, however, that these cases are not in harmony with the decisions of this court relative to forfeiture of this character.* But, in any event, we do not think the evidence in this case warrants the assumption that it was a physical impossibility for the lessee to have substantially complied with its covenant
> . . . .
> Having failed to give the notice required under the terms of the lease, this action cannot be maintained for cancellation of the lease or for damages for breach.

*Id.* at 182 (citations omitted).

In *Gray v. Gregory*, 36 Wn.2d 416, 218 P.2d 307 (1950), the court went a step further in protecting the interests of a lessee who was contractually entitled to notice and an opportunity to cure any breach of its lease. The lessee had breached the lease by beginning to remodel its leased premises without first providing the lessor with a required notice and a deposit of either waivers, security, or funds sufficient to protect the lessor

20

from mechanics' and materialmen's liens. The lessor sued without giving a notice of default required by the lease, claiming that "no notice of default was necessary upon the ground that the breach was incurable and irremediable": it was too late to comply with the required sequence of making a deposit *before* beginning construction. *Id.* at 417-18.

The court agreed that the lessee would not be able to undo the improper sequence of its actions, but focused on the notice-and-cure provision in the contract and held that "the parts of a contract must be construed together and effect given to each part." *Id.* at 418. Reading the contract as a whole, it held that the lessor "did not, and could not, allege a cause of action for forfeiture . . . without alleging a compliance with the requirements of [the notice-and-cure clause]." *Id.* at 419. In essence, it elevated the requirement to give notice and an opportunity for cure over the requirement that the lessee deposit the required security before commencing construction, observing that the latter requirement involved acts "of such a nature that they, aside from the requirements of the lease, are capable of execution independently and in either sequence or simultaneously." *Id.* at 418; *see also S.T. McKnight Co. v. Cent. Hanover Bank & Trust Co.*, 120 F.2d 310, 327 (8th Cir. 1941) (citing *Republic* with approval and holding that "where forfeiture is dependent upon the making of a demand and failure to comply with the demand, the failure to make a proper specific and reasonable demand is fatal to the enforcement of the forfeiture by a court of law or equity").

21

Lamb Weston baldly asserts that *Republic*, *Gray*, and other cases relied upon by DC Farms "[govern] forfeiture of real property and unlawful detainer [and] do not apply to the Agreement at issue in our case, which is not a leasehold agreement." Br. of Resp't at 16. We agree that unlawful detainer cases are distinguishable to the extent that they rely on the notice required by *statute* before suit can be filed. But none of the cases we examine above was pursued under an unlawful detainer statute. Lamb Weston identifies nothing in *Republic* or *Gray* that limits their analysis of contract principles to contracts involving real estate. It offers neither legal authority nor argument as to why we should analyze the parties' rights in the context of this contract any differently. We do not consider conclusory arguments unsupported by authority. RAP 10.3(a)(6), (b); *Joy v. Dep't of Labor & Indus.*, 170 Wn. App. 614, 629, 285 P.3d 187 (2012), *review denied*, 176 Wn.2d 1021 (2013). As we read *Republic* and *Gray*, the key to their outcome is not that the contracts involved real property. It is that they involved consequences of forfeiture significant enough that the parties explicitly provided for notice and an opportunity to cure before a forfeiture could be declared.

In light of this clear and controlling precedent, we cannot adopt the reasoning of *Stacey*.[3] We are also convinced that requiring compliance with the notice-and-cure

---

[3] Lamb Weston actually relies on dicta in *Stacey*. On its facts, *Stacey* is distinguishable. The parties' contract in *Stacey* included a notice-and-cure provision but unlike the contract in this case, it also explicitly provided that one particular default—late monthly payments more than 3 times in 12 months—would constitute an incurable

provision is the better rule. It reduces the prospect of litigation. As the introductory note

to the *Restatement*'s chapter dealing with performance and nonperformance observes:

> When a party fails to receive the performance that he expects, the wisest course is ordinarily for the parties to attempt to resolve their differences by negotiations, including clarification of expectations, cure of past defaults, and assurance as to future performance. If these efforts fail, the injured party may pursue his claim in court. It is, of course, always possible to leave a party who is aggrieved by his failure to receive the expected exchange to pursue a claim for damages against the other party. But contracting parties ordinarily bargain for performance rather than for a lawsuit.

RESTATEMENT ch. 10, introductory note.

A party who has bargained for a notice-and-cure provision to protect against

forfeiture and litigation is entitled to have that bargained-for protection honored. And if

the party who seeks to terminate the contract truly believes that the default cannot be

cured, then giving notice—with the result that any steps actually taken and proposals

actually made will be in evidence—will produce a more reliable and thereby fairer basis

for deciding whether the breach was curable. Where, as here, the notice-and-cure

provision is breached, the jury is required to decide the disputed cure issue based on

contrasting theories of "what might have been."

Lamb Weston did not comply with the steps required to terminate the parties'

agreement. DC Farms was entitled to summary judgment that Lamb Weston breached

---

default. It was that automatic incurable default, which did not require notice or an opportunity to cure, that was the basis for terminating the contract in *Stacey*.

the agreement by purporting to summarily terminate it without complying with the provisions for termination.[4]

## II. *Whether DC Farms committed a material, incurable breach is genuinely disputed.*

Although it breached the notice-and-cure provision, Lamb Weston may still defend on the basis that the glass contamination that caused it to refuse to further perform under the parties' agreement could not be cured. In suits for money damages for breach of contract a court may dismiss a breach of contract action if damages have not been suffered. *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 139 Wn. App. 743, 754, 162 P.3d 1153 (2007). Mere proof that there was a breach of contract without more will not support a verdict in favor of a plaintiff, even for nominal damages. *Ketchum v. Albertson Bulb Gardens, Inc.*, 142 Wash. 134, 139, 252 P. 523 (1927).

---

[4] Lamb Weston argues alternatively that it delivered a written letter to DC Farms on November 19 advising DC Farms of its decision to terminate; that if a written notice of default was required, then it was provided by this November 19 letter; that no cure was effectuated between November 19 and November 26; and that the parties' agreement therefore came to an end on November 26, seven days after the delivery of the letter. The argument is frivolous. The letter unequivocally purported to terminate the agreement, not to give a notice of default. Executives of Lamb Weston testified that even before delivering the letter, they had made the decision and verbally communicated to DC Farms the decision to "reject all of [the DC Farms] potatoes" and "that the strategic supply agreement was terminated." CP at 305-06, 311. *See Gray*, 36 Wn.2d at 417 (recognizing that a notice terminating an agreement is not a "notice of default, as such" and nor was "time allowed in which to cure the alleged breach").

Lamb Weston sought summary judgment dismissing the action below on the grounds that DC Farms's breach resulted in "pervasive glass contamination making the potatoes unsafe for human consumption," which it contends was a sufficient basis for rejecting all potatoes grown and stored by DC Farms and was incurable. CP at 330. It specifically argued that it was not "contractually or legally required to accept 'replacement potatoes' from other operations." CP at 340 (boldface and capitalization omitted).

Viewing the evidence in the light most favorable to DC Farms, however, whether its asserted breach was incurable depends on facts that are genuinely disputed. DC Farms does not dispute Lamb Weston's key contention that small pieces of glass embedded in potatoes would evade visual detection. But it treats that contention as true for all potatoes processed by Lamb Weston, from any grower. Its dispute is more basic: it disputes that there was a reasonable basis for believing that its potatoes, or the vast majority of its potatoes, presented any greater risk of glass contamination than other potatoes processed by Lamb Weston.

The parties presented conflicting evidence whether Lamb Weston had processed raw potatoes stored in cellars served by burned out, missing, or broken light bulbs in the past. They presented conflicting evidence whether Lamb Weston's refusal to process potatoes from all of DC Farms's eight cellars based on two broken light bulbs (one contained in a membrane) traced to a single cellar was consistent with its contract

obligations. They presented conflicting evidence whether Lamb Weston's refusal to accept substitute potatoes offered by DC Farms at the same time it processed raw potatoes from other, nonjoint venture growers, whose cellars it never inspected or approved, was consistent with its contract obligations.

Turning to Lamb Weston's argument that it was not required to accept "replacement potatoes," we will grant that the parties' agreement did not contemplate that Lamb Weston would accept whatever potatoes DC Farms proposed to make available. The agreement contemplated that Lamb Weston would buy "the Crop": the potatoes grown on the acreage identified by the contract and cultivated under its comanagement. These, however, were the very potatoes that Lamb Weston refused to accept. A genuine issue of fact remains whether Lamb Weston's refusal to accept the Crop (or much of it) complied with its obligations under the agreement.

In addition, a genuine issue of fact remains whether the provenance of the potatoes to be accepted by Lamb Weston under the agreement, although addressed by the agreement, was material. It appears undisputed that DC Farms complied with its contractual obligation to grow potatoes on the designated ground and to manage the growing operation jointly with Lamb Weston. Since it operated under the parties' agreement for almost 10 months (the entire growing season) without breaching those provisions, the "cure" issue that arises is whether, if, and to the extent that Lamb Weston was entitled to refuse all or a portion of the Crop, DC Farms's delivery of substitute

26

potatoes would constitute substantial performance of the remainder of the parties' agreement.

In assessing materiality, there is no evidence that Lamb Weston offered a joint venture arrangement to DC Farms because it was looking for potatoes from farm ground in Ranges 35E, 36E, and 37E in Bingham County, Idaho. As noted earlier, Lamb Weston executives testified that what they were looking for in a joint venture partner was a farmer who owns or controls ground, has "[t]he ability to farm and basically a proven record of some sort that they can grow potatoes," whether there is "a definite interest on [the farmer's] part to go into a partnership arrangement," and the presence of "[s]uccession," meaning that a farmer can be expected to be in the business for a long period of time. CP at 237-38. Lamb Weston acquires many potatoes that it processes from farmers whose cultivation it does not comanage.

As DC Farms points out, the parties' agreement appears implicitly to recognize delivery of substitute potatoes as a permitted cure by treating negligence or misconduct that "result[s] in *the loss of, or damage to, a material portion of the Crop*" as an event that is subject to a seven-day cure period. CP at 15 (emphasis added). Where a material portion of the Crop is lost or damaged, substitution would be the only possible cure.

A material breach sufficient to allow rescission of a contract is one that "substantially defeats the purpose of the contract." *Mitchell v. Straith*, 40 Wn. App. 405, 410, 698 P.2d 609 (1985). A jury could find that even if DC Farms breached the

27

contract, its breach was only partial. A breach need not be material to give rise to a cause of action for damages. *TMT Bear Creek*, 140 Wn. App. at 210. Any failure to perform a contractual duty constitutes a breach and an injured party is generally entitled to those damages necessary to put that party in the same economic position it would have occupied had the breach not occurred. *Id.* (citing RESTATEMENT § 235(2); *Rathke v. Roberts*, 33 Wn.2d 858, 865-66, 207 P.2d 716 (1949)). A jury that found that DC Farms had "faithfully endeavored to perform [its] contract in all material and substantial particulars, so that [its] right to compensation may not be forfeited by [an] inadvertent . . . omission[] or defect[]," *see Donald W. Lyle*, 45 Wn.2d at 812, could hold Lamb Weston to the contract but award it money damages for any difference in value between what it had expected to receive (potatoes having the preglass contamination characteristics of the Crop) and what DC Farms was able to deliver instead.

Given these genuine issues of disputed fact, summary judgment in Lamb Weston's favor was improper.

In light of our reversal of the trial court's summary judgment in favor of Lamb Weston, we need not reach DC Farms's third assignment of error.

We reverse the trial court's order and judgment dismissing DC Farms's complaint. We remand (1) for entry of an order granting summary judgment in DC Farms's favor that Lamb Weston breached the Strategic Potato Supply Agreement by failing to provide

28

No. 30963-1-III
*DC Farms LLC v. Conagra Foods Lamb Weston, Inc.*

written notice of default and refusing to give DC Farms an opportunity to cure and (2) for

trial on all remaining issues, consistent with this opinion.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Brown, J.

_____
Kulik, J.