IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| NATHAN JORGENSEN, an individual, | No. 85752-5-I |
| Respondent/Cross Appellant, | |
| v. | |
| SUBDUED EXCITEMENT INC., a Washington corporation; NICHOLAS CIHLAR, an individual; and SETH WEISSMAN, an individual, | UNPUBLISHED OPINION |
| Appellants/Cross Respondents. | |

BOWMAN, J. — Subdued Excitement Inc. appeals the trial court's grant of summary judgment for Nathan Jorgensen, one of its shareholders, related to a CR 2A agreement for the company to buy back Jorgensen's shares. Subdued argues the CR 2A agreement was unenforceable or, in the alternative, that material issues of fact precluded summary judgment. We conclude that the CR 2A agreement is enforceable but that issues of material fact preclude summary judgment. We reverse and remand for further proceedings.

FACTS

Jorgensen, Nicholas Cihlar, and Seth Weissman owned and operated Subdued, a cannabis producer and processer licensed by the Washington State Liquor and Cannabis Board (LCB). The three were Subdued's only voting shareholders. They were also members of Subdued's board of directors and salaried employees.

In late 2020, a disagreement arose between the shareholders. Jorgensen suspected Cihlar and Weissman were self-dealing, exceeding their authority, and wasting the company's money. Specifically, Jorgensen believed Cihlar and Weissman gave themselves substantial raises without his consent, used company money to construct a storage facility at Subdued's primary place of business, the "Iron Gate Property,"[1] and then used the facility to illegally grow cannabis and to store product from another of Cihlar's businesses rent-free. As a result of the dispute, Subdued agreed to buy back Jorgensen's shares of the company.

In April 2021, Jorgensen, Cihlar, and Weissman agreed to the terms of the share buyback and memorialized their resolution under CR 2A. Under the CR 2A agreement, Subdued agreed to buy Jorgensen's shares for $1.7 million, subject to payment terms. Subdued would make an "[i]nitial non-refundable [$20,000.00] deposit to be applied to the purchase price, paid upon execution of the formal agreements"; and an "[i]nitial Payment [of $150,000.00] at closing within 10 business days of approval of the sale by the LCB."[2] The parties also agreed that Subdued would pay the "[r]emaining balance of $1,500,000[.00]"[3]

> pursuant to a [promissory] note with a five year term, with monthly
> payments amortized over 20 years, at [six percent] interest, with

---

[1] Iron Gate Development Inc. owns the Iron Gate Property, and Subdued is its sole member. The Iron Gate Property serves as Subdued's principal place of business on its LCB license.

[2] Because Subdued is a licensed cannabis producer, the LCB had to approve any change in company ownership.

[3] This amount appears to be an error. The parties agreed to a $1.7 million purchase price. So, after the $20,000 deposit and $150,000 initial payment, Subdued would owe a balance of $1.53 million.

monthly payments of $10,961.40. The note payments will begin May 1, 2021 and be deducted from the principal/accrued interest of the note. If the sale is not ultimately approved by the LCB, then any payment made prior to this final decision will be considered a non-refundable deposit. The final balloon payment of $1,309,924[.00] will be due at the end of the five year term.

The agreement further provided that "[Jorgensen]'s employment with [Subdued] will terminate effective March 31, 2021."[4]

The parties agreed to secure Jorgensen's promissory note three ways. First, "by the one existing [cannabis] license of Subdued."[5] Second, "by the shares he is selling back to the Company, with a semi annual adjustment to the number of shares secured based upon the principal amount still owed under the note."[6] And finally, "by a third[-]position deed of trust in the [Iron Gate Property]." The deed of trust provision was "subject to approval of the two current holders of [the] deeds of trusts" on the Iron Gate Property, Blackburne & Sons Realty Capital Corporation and J&A Properties LLP.[7]

The agreement required Jorgensen to immediately sign a corporate resolution that approved a $100,000 option for Subdued to purchase a property

---

[4] And it authorized Jorgensen to "use any seeds and genetics unique to [Subdued] after he resigns, but only for his personal operation, or any operation that he owns."

[5] This term was subject to approval by the LCB. The record does not show whether the LCB approved the condition.

[6] This term was also subject to LCB approval. The LCB rejected the parties' request. Jorgensen does not allege breach for failure to comply with this term.

[7] Blackburne held the first-position deed of trust as security for a $975,000 loan. And J&A held the second-position deed of trust on the Iron Gate Property to secure a $380,000 loan. The parties agreed that if Subdued defaulted on either of the higher priority deeds, it "would be treated as a default on [Jorgensen]'s note as well, permitting him to immediately call the note due." But "[a]n acceleration of the Blackburn[e] note other than for a default will not authorize [Jorgensen] to accelerate the note."

3

owned by Cihlar, and to approve documents related to Subdued's purchase of a second cannabis license. And finally, the parties agreed that "[t]he purchase shall be subject to mutual agreement and execution of a formal stock redemption agreement and ancillary documents, which the parties shall work in good faith to complete and execute by April 30, 2021."[8]

On April 1, 2021, the parties executed the agreement under CR 2A, "making this a binding" agreement. Jorgensen later approved the corporate resolution authorizing Subdued's option to buy Cihlar's property. The parties then began preparing the documents necessary to complete Jorgensen's stock buyback.

On April 13, 2021, Subdued sent Jorgensen drafts of the closing documents—the redemption agreement, the promissory note, a third-position deed of trust, a genetics licensing agreement, and a bill of sale. It also sent Jorgensen documents to approve Subdued's purchase of the second cannabis license. In turn, Jorgensen sent Subdued a security agreement for Subdued's LCB license.

Two days later on April 15, Subdued asked about Jorgensen's progress in reviewing the documents it sent, hoping that "only fine tuning is required." Subdued also sent Jorgensen two new documents related to the second license purchase. Jorgensen signed and returned the two new documents immediately.

---

[8] Subdued also agreed to "hold harmless, defend and indemnify [Jorgensen] on any Company note that he may have personally guaranteed."

On May 11, 2021, Subdued resent Jorgensen the closing documents and again asked about the status of his signatures. It noted that it modified the documents to reflect payments under the promissory note "starting June 1 as opposed to May 1, since that date has passed." It told Jorgensen that if he did not return the signed redemption agreement and promissory note by May 14, 2021 at 5:00 p.m., "we will consider negotiations terminated and the company's offer . . . shall expire."

Three days later on May 14, Jorgensen executed all the agreements. He informed Subdued that he had the signed documents but that he had not yet returned them. Instead, he asked for confirmation that Subdued had obtained all the necessary signatures for the third-position deed of trust, security agreement, and license agreement. Subdued responded that it would deliver the signed deed of trust and security agreement at closing. But Subdued also said that it was still "working with the lender[s]" to see if they would agree to a third-position deed of trust.[9] Jorgensen replied that he was "[h]appy to send over [his] signatures when we have confirmation" that the senior lien holders consented to the deed of trust.

Between May 14 and May 26, 2021, the parties spiraled into conflict over Jorgensen's refusal to return the signed redemption agreement and Subdued's failure to secure the third-position deed of trust. They could not resolve the issues and did not close the deal.

---

[9] Despite Subdued's representation, it had not yet contacted the lenders for approval of Jorgensen's deed of trust.

In July 2021, Jorgensen sued Subdued, Cihlar, and Weissman. He alleged breach of the CR 2A agreement, promissory estoppel, unjust enrichment, breach of fiduciary duty, conversion, and accounting and receivership, and he sought judicial dissolution of the company. Subdued counterclaimed for declaratory relief, breach of the CR 2A agreement, breach of the implied duty of good faith and fair dealing, breach of fiduciary duties, and breach of the shareholder agreement.

In November 2021, Jorgensen moved to enforce the CR 2A agreement. The court heard the motion in January 2022 and took the matter under advisement. But it later continued the motion for the parties to conduct further discovery. On September 29, 2022, Jorgensen amended his complaint to also allege breach of Subdued's shareholder agreement.

In December 2022, Jorgensen moved for summary judgment for breach of contract. He argued that Subdued materially breached the CR 2A agreement by failing to make any of the required payments, by failing to make good faith efforts to secure the third-position deed of trust before April 30, 2021, and by terminating the agreement. Jorgensen requested a $1.7 million judgment with prejudgment interest. Alternatively, Jorgensen asked the court to order Subdued to specifically perform under the CR 2A agreement.

Subdued filed two cross motions for summary judgment. In one, Subdued sought partial summary judgment, arguing the agreement was not enforceable because "Jorgensen cannot establish that there was a meeting of the minds between the parties as to the scope of Subdued's obligation to provide security to

6

his note associated with the buy back of his shares." In the other, Subdued again sought partial summary judgment, arguing the parties' CR 2A agreement was not enforceable because it was subject to conditions precedent that Jorgensen did not satisfy. The court heard oral argument on January 19, 2023 and took the matters under advisement.

On March 27, 2023, the court ruled on Jorgensen's motion to enforce and Subdued's motions for partial summary judgment. It held that the CR 2A agreement is valid and enforceable. It found that "as of April 1, 2021, the parties reached a [CR 2A] Agreement regarding the buy[ ]back of Plaintiff's shares in Subdued." And "[w]hile the parties envisioned later memorialization by formal documents, the agreement at that time was sufficiently definite as to its subject matter, its terms, and the intent of the parties to be bound."

The court found that under the agreement, "Subdued was obligated, among other things, to use good faith to obtain the consents of two senior lien holders prior to the formalization of final documents on April 30, 2021, and to begin installment payments on May 1, 2021." It found that "Subdued failed to fulfill these obligations, and thus materially breached the . . . agreement." Finally, the court found that Subdued accepted partial performance by Jorgensen when he approved the corporate resolution, and that Subdued was "thereafter obligated to continue to perform under the agreement." And it rejected the argument that Jorgensen's delivery of the stock redemption agreement was a condition precedent to enforcement of Subdued's obligations. Based on the "clear language" of the CR 2A agreement, the court held that "while the stock

7

redemption agreement was clearly material to the overall agreement, its performance was timed to the formalization of final documents, rather than being a pre-condition to other obligations." That is, "neither Subdued's obligation of good faith, nor its promise to begin installment payments on May 1, 2021, were conditioned upon it."

The court determined that the appropriate remedy was specific performance. But it recognized that under the CR 2A agreement, Subdued was to pay the $1.7 million as

> (1) $20,000[.00] upon execution and delivery of the formal stock redemption agreement; (2) $150,000[.00] upon LCB approval of the sale; (3) monthly payments of $10,961.40 for five years beginning May 1, 2021; and (4) a $1,309,924.00 balloon payment at the end of the five-year note term.

So, it found that Subdued owed Jorgensen for the monthly payments beginning May 1, 2021, and that Jorgensen was "entitled to these payments as of that date at an interest rate of [six percent] annually." But because Subdued paid Jorgensen his salary for April and May 2021,[10] the court offset the judgment by the difference of the two amounts. The court then denied Subdued's cross motions for summary judgment and ordered each party to pay their own attorney fees.

On August 16, 2023, the court entered an order granting in part Jorgensen's motion for summary judgment and denying Subdued's motions for partial summary judgment, incorporating its March 27, 2023 ruling. It again found that Jorgensen was entitled to specific performance under the CR 2A agreement.

---

[10] As stated earlier, under the agreement, Jorgensen's employment with Subdued terminated March 31, 2021.

8

And it found that Jorgensen was entitled to $306,919.20 in past-due monthly installments from Subdued, plus six percent prejudgment interest, minus $15,976.48 for the two months' salary Subdued paid Jorgensen.  The court dismissed with prejudice Jorgensen's claims of promissory estoppel and unjust enrichment based on his stipulation that the court's order rendered them moot.  And the court dismissed with prejudice any remaining claims by Subdued and Jorgensen, concluding they "are all premised or otherwise dependent upon [Jorgensen]'s continued interest in Subdued or the unenforceability of the CR 2A Agreement."

The same day, the court entered a judgment for Jorgensen and against Subdued.  It ordered Subdued to pay Jorgensen $306,919.20 for the unpaid monthly installments between April 2021 and August 2023.  It awarded six percent interest on the principal amount for a total of $20,717.08.  Factoring in the $15,976.48 offset for Jorgensen's salary, the court awarded a total judgment of $311,659.80.  And it ordered postjudgment interest would accrue at six percent.

Subdued appeals the court's order and judgment.  Jorgensen cross appeals the judgment.

ANALYSIS

Subdued argues the trial court erred by concluding that the CR 2A agreement was enforceable and that undisputed evidence shows it breached the agreement.

We review a trial court's grant of summary judgment de novo, engaging in the same inquiry as the trial court. *Cruz v. Chavez*, 186 Wn. App. 913, 920, 347 P.3d 912 (2015); *Young v. Key Pharms.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989). A party is entitled to summary judgment where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Young*, 112 Wn.2d at 226.

1. Mutual Assent

Subdued argues the CR 2A agreement is unenforceable because "the parties lacked a meeting of the minds as to Subdued's obligation under the [Deed of Trust] Provision." We disagree.

A trial court's authority to compel enforcement of a settlement agreement is governed by CR 2A. *Morris v. Maks*, 69 Wn. App. 865, 868, 850 P.2d 1357 (1993). CR 2A provides:

> No agreement or consent between parties or attorneys in respect to the proceedings in a cause, the purport of which is disputed, will be regarded by the court unless the same shall have been made and assented to in open court on the record, or entered in the minutes, or unless the evidence thereof shall be in writing and subscribed by the attorneys denying the same.

We apply general principles of contract law to written settlement agreements. *Morris*, 69 Wn. App. at 868; *Cruz*, 186 Wn. App. at 920. And Washington follows the objective manifestation theory of contracts. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). That is, to form a contract, the parties must objectively manifest their mutual assent to be bound, and the terms assented to must be sufficiently definite.

10

*Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 177-78, 94 P.3d 945 (2004). A contract that lacks such a "meeting of the minds" is invalid and unenforceable. *Kofmehl v. Baseline Lake, LLC*, 167 Wn. App. 677, 695, 275 P.3d 328 (2012), *aff'd*, 177 Wn.2d 584, 305 P.3d 230 (2013).

Whether parties mutually assented to a contract is normally a question of fact but may be determined as a matter of law where reasonable minds could reach but one conclusion. *Keystone*, 152 Wn.2d at 178 n.10. We try to determine the parties' intent "by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst*, 154 Wn.2d at 503. The parties' subjective intent is generally irrelevant if we can determine their intent from the reasonable meaning of the words used in the agreement. *Id.* at 503-04. When a party signs a contract, that party is presumed to have objectively manifested assent to its contents. *Cruz*, 186 Wn. App. at 920-21. The burden of proving a contract, including the existence of mutual assent, is on the party asserting it. *Saluteen-Maschersky v. Countrywide Funding Corp.*, 105 Wn. App. 846, 851, 22 P.3d 804 (2001).

Here, the CR 2A agreement provided that "[Jorgensen]'s note will be secured by a third[-]position deed of trust in the [Iron Gate Property], subject to approval of the two current holders of deeds of trusts." That is, the senior deeds of trust holders had to approve Jorgensen's third-position deed of trust. Nothing in the provision is ambiguous or otherwise suggests a lack of mutual assent. And both parties signed the agreement, so we presume they have objectively manifested assent to its contents.

11

Subdued contends that evidence outside the contract shows there was no meeting of the minds, or at least raises an issue of material fact over mutual assent. It points to emails between the parties after entering the CR 2A agreement and Jorgensen's deposition testimony during litigation, in which he disputes the meaning of the deed of trust provision language. But in assessing mutual assent, we look to the parties' intent at the time they formed the agreement, not the interpretation they advocate at the time of litigation. *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013). Neither the parties' emails nor assertions in depositions are relevant to our consideration of intent because they occurred after formation of the CR 2A agreement.[11] And the outward manifestations and circumstances at the time of the agreement show that the parties mutually agreed to the deed of trust terms.

2. Condition Precedent

Subdued also argues the CR 2A agreement is unenforceable because Jorgensen failed to deliver an executed redemption agreement—a "condition precedent" to its obligation to act under the agreement. Jorgensen argues that there is no condition precedent and that the CR 2A agreement "is binding and enforceable." We agree with Jorgensen.

After forming a valid contract, a "condition precedent" is an event that must occur before a right to immediate performance materializes. *Jones Assocs., Inc. v. Eastside Props., Inc.*, 41 Wn. App. 462, 466, 704 P.2d 681

---

[11] Subdued also points to Jorgensen's refusal to deliver the executed redemption agreement until Subdued secured the deed of trust as evidence that the parties lacked mutual assent. But this also occurred after the parties executed the agreement.

(1985). Unlike breach of a promise, "which subjects the promisor to liability for damages but does not necessarily discharge the other party's duty of performance," a nonoccurrence of a condition precedent "prevents the promisee from acquiring a right or deprives him of one but subjects him to no liability." *Jones*, 41 Wn. App. at 466. "Whether a contract provision is a condition precedent or a contractual promise depends on the intent of the parties, to be determined from a fair and reasonable construction of the language used in light of all the surrounding circumstances." *U.S. Bank Nat'l Ass'n v. Roosild*, 17 Wn. App. 2d 589, 599, 487 P.3d 212 (2021) (citing *Lokan & Assocs., Inc. v. Am. Beef Processing, LLC*, 177 Wn. App. 490, 499, 311 P.3d 1285 (2013)). If there is doubt as to whether words create a condition precedent or a promise, we interpret them as creating a promise. *Jones*, 41 Wn. App. at 466.

Here, the CR 2A agreement says that "[t]he purchase shall be subject to mutual agreement and execution of a formal stock redemption agreement and ancillary documents, which the parties shall work in good faith to complete and execute by April 30, 2021." Subdued points to the term "subject to" in the provision, arguing those are "critical words" that have "consistently been recognized as creating a condition precedent." Subdued contends the language creates a condition precedent to "all obligations contained in the CR 2A Agreement," including its obligations to seek approval for Jorgensen's third-position deed of trust from the senior lienholders and to make monthly payments. According to Subdued, "[i]nquiry of the senior holders of a deed of trust and

payment of the monthly installments were components of the 'purchase' making each obligation subject to the condition precedent."

But Subdued misconstrues the provision. While the agreement contemplates execution of the redemption agreement as a condition precedent to "[t]he purchase," it is not a condition precedent to Subdued's performance of its obligations in support of the purchase. As such, the agreement requires Subdued to perform those tasks necessary to carry out the purchase, whether or not Jorgensen executed the formal redemption agreement.

Because the parties mutually assented to the CR 2A agreement, and Jorgensen's delivery of an executed redemption agreement was not a condition precedent to Subdued's obligation to act under the agreement, the trial court did not err in concluding that the CR 2A agreement is binding and enforceable.

3. <u>Breach</u>

Subdued argues that even if the CR 2A agreement is enforceable, the trial court erred because there are issues of material fact that preclude summary judgment for Jorgensen. Jorgensen argues that undisputed evidence shows Subdued materially breached the CR 2A agreement. We agree with Subdued.

Generally, parties to a bilateral contract must substantially comply with their obligations under the contract. *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wn. App. 205, 220, 317 P.3d 543 (2014). To substantially perform, a party must "faithfully endeavor[ ] to perform their contract in all material and substantial particulars." *Id.* If a party does not, it materially breaches the contract. *Id.* "A material breach is one that 'substantially defeats' a

primary function of an agreement," and it justifies the other party to abandon the contract. *224 Westlake, LLC v. Engstrom Props., LLC*, 169 Wn. App. 700, 724, 281 P.3d 693 (2012). The materiality of a breach is generally a question of fact. *Id.*

Here, several disputed material facts about breach remain. For example, Jorgensen argues that Subdued materially breached the CR 2A agreement when it failed to make the first monthly payment on May 1, 2021. But Subdued argues that even though it did not pay the monthly installment, it was not a material breach because it paid Jorgensen a similar amount as "unentitled-to wages" that month. Jorgensen also argues that Subdued materially breached the agreement by not timely seeking permission from the senior lienholders for his third-position deed of trust. Yet Subdued says that it had no obligation to seek consent of the senior lienholders by a particular date, and that it acted in good faith "because it wanted to wait until the parties had formalized the deal" before contacting the lienholders. Further, Jorgensen argues that Subdued breached their agreement by unilaterally repudiating the CR 2A agreement when it "slipped into its final draft of the settlement documents terms materially different from the CR 2A Agreement (such as timing of the initial payment and delivery of certain ancillary documents)." But Subdued asserts it did so only after Jorgensen breached the parties' CR 2A agreement by failing to provide an executed redemption agreement.

Because disputed material facts exist as to whether and when a breach occurred, no party is entitled to summary judgment. We reverse and remand for further proceedings.[12]

Brunner, J

WE CONCUR:

Feldman, J.                    Chung, J.

___

[12] In Jorgensen's cross appeal, he argues that the trial court erred when it declined to award him a judgment for the full liquidated sum of $1.7 million on Subdued's payment obligations. Jorgensen also asks for costs on appeal. Because we conclude there are issues of material fact precluding summary judgment for all parties, we do not reach these issues.