# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PAR HAWAII, LLC, | No. 60306-3-II |
| Respondent, | |
| v. | |
| SAPPHIRE FAIRWOOD, LLC, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Sapphire Fairwood LLC (Sapphire) purchased a gas station leased by Par Hawaii LCC (Par). The lease lasted until 2043 with periodic rent increases. The lease required Par to pay rent on or before the first day of the month, maintain general liability insurance, send a certificate of liability insurance to Sapphire, and maintain property insurance with Sapphire as a loss payee.

Days before Sapphire purchased the property, Par paid the prior owners rent for October 2021. Soon after Sapphire purchased the property, it sent Par several notices threatening default and forfeiture of the lease for failure to comply with the statute of frauds, failure to timely pay October rent, and failure to comply with insurance requirements. Par made multiple requests for information from Sapphire so it could set up automatic rent payments, but Sapphire did not cooperate. Par maintained sufficient insurance coverage for the property, but it did not initially provide Sapphire with an accurate certificate of general liability insurance and did not explicitly list Sapphire as a loss payee under its property insurance. Sapphire eventually claimed termination

of the lease and filed an unlawful detainer action against Par. Par sued Sapphire for breaching the lease and breaching covenants of quiet enjoyment and good faith and fair dealing. The trial court consolidated the lawsuits.

After a bench trial, the trial court found that Par properly paid October rent by timely paying the prior owner. The trial court excused Par's failure to provide a certificate of general liability insurance because Sapphire was always covered, and the failure to provide a timely certificate was not a material breach of the insurance requirements in the lease. And the trial court concluded that Sapphire was a loss payee under Par's property insurance policy. In sum, the trial court concluded that the lease was still binding and enforceable and dismissed Sapphire's unlawful detainer claim. The trial court awarded costs to Par.

Sapphire appeals. We hold that Par fulfilled its obligations under the lease by paying October rent to the prior owner. Additionally, any delay in Par's rent payments was excused by Sapphire's bad faith. We also conclude that both the failure to provide a general liability insurance certificate and the failure to add Sapphire as a loss payee on a property insurance certificate were not material breaches of the lease and did not warrant forfeiture. We affirm.

FACTS

I. BACKGROUND

The following facts are partially drawn from the unchallenged findings of fact in the trial court's order, which are verities on appeal. *Nguyen v. City of Seattle*, 179 Wn. App. 155, 163, 317 P.3d 518 (2014). Moreover, most of the facts are undisputed.

A.    Par's Commercial Lease

In 2016, CHS Inc. leased a property in Spokane from Vandervert North LLC. In 2018, Par[1] took over the lease from CHS. Par operated the leased property as a gas station and convenience store.

The lease did not include a written description of the property but instead attached an exhibit where the property was "depicted graphically and outlined in red." Clerk's Papers (CP) at 43. The lease included a quiet enjoyment clause ensuring that Par would "peacefully have, hold[,] and enjoy" the property during the lease term. CP at 46.

The lease outlined an initial ten-year term, starting in 2018, which automatically extended for three additional five-year renewal terms unless Par declined. The rent for the first five years of the initial term, starting in 2018, was $6,000 per month, with rent increases every five years and a final rent increase in 2038 to about $8,750 per month. In contrast, Sapphire believed the market rental rate for the property was $18,000 per month. Par was required to pay rent in advance on or before the first day of each month.

The lease also imposed insurance requirements. First, Par was required to provide general liability insurance and "include the Landlord as an additional insured." *Id.* As part of this requirement, Par "shall provide Landlord with a Certificate of such liability insurance each year." *Id.* Par was also required to have property insurance covering the leased property. Under the lease, Par's property insurance "shall insure Tenant and the Landlord as their interests may appear." *Id.* And the lease stated that the landlord "is added as a loss payee" under this insurance. *Id.* A "loss

---

[1] Par is a wholly owned subsidiary of Par Pacific Holdings Inc., which is a publicly traded energy company.

payee" is defined as a "person or entity named in an insurance policy (under a loss-payable clause) to be paid if the insured property suffers a loss." BLACK'S LAW DICTIONARY 1131 (12th ed. 2024).

The lease also included a default and termination clause:

> If[ ]at any time during the term of this Lease [Par] shall fail to pay the rentals provided for herein or if [Par] shall fail to comply with any of the other terms and conditions of this Lease, the Landlord may give written notice to [Par] to pay such rentals or otherwise comply with the terms and provision of this Lease, as the case may be. If such default is not cured within ten (10) days as to a default in the payment of rent or within thirty (30) days as to any other default after such notice, the Landlord shall have, in addition to such remedies as may be afforded by the laws of the State of Washington, the power and right to declare this Lease terminated and re-enter the Premises.

CP at 47.

The default and termination clause also provided for an extension of the cure period if the defect required more than 30 days to remedy and the tenant was acting diligently to cure the defect.

The lease allowed that if a tenant remained in possession of the property after termination without the landlord's written consent, the tenancy would be "at will" and monthly rent would increase to 110% of the rental rate. CP at 48. Under this holdover clause, the landlord could terminate the tenancy with 30-days' notice.

The lease specified that all notices and communications should be mailed to the addresses listed in the lease, or to "such other address as either party shall designate by written notice to the other party." CP at 49. The lease stated that all notices and communications "shall be effective when actually delivered, if in person, or when actually received . . . or on the third business day after being deposited in the mail." *Id.*

4

In 2018, Par sent an official notice to Vandervert stating that all future notices to Par should be sent to an address on 1st Avenue in Spokane. At some point before the actions in this case, Par moved from this location but did not provide Vandervert with an updated address.

B.    Sapphire's Purchase of the Property

In 2021, Sapphire began the process of purchasing the property from Vandervert. Sapphire is a hotel and rental property business. Roger Hothi was the manager of Sapphire, and his wife and mother were the only members of the corporation.

On September 17, 2021, a Vandervert employee emailed Par and asked it to sign a document in anticipation of Vandervert selling the property. The Vandervert employee explained that Vandervert wanted Par to sign the document because "[w]e are trying to close this sale by this Friday." Ex. D112, at 66. The Vandervert employee also stated, "I will email you a letter once the sale is closed, which will formally introduce the new owners and provide you with contact info." *Id.* Par sent the document to its legal team, but did not end up signing the document.

On September 24, Par emailed the Vandervert employee asking, "[c]an you please let us know who the new owner/landlord will be?" *Id.* The Vandervert employee replied, "'Sapphire Fairwood LLC'" and attached Sapphire's business information, including its mailing address. *Id.* However, Vandervert never sent Par a letter confirming that the sale closed.

On September 28, about the time when Par's insurance policy renewed, Par sent Vandervert a certificate of general liability insurance. The certificate did not include the landlord as an additional insured, but it was the same certificate Par sent to Vandervert in previous years without controversy.

On September 29, Par sent its October 2021 rent check to Vandervert.

C.      Sapphire's Initial Communications with Par

Vandervert's sale of the property to Sapphire closed on September 30. That day, Sapphire sent a letter to Par's listed 1st Avenue address (where Par was no longer located) informing Par about the change of ownership and asking Par to "direct all rent payments to the mailing address below effective immediately." CP at 55. The letter included a mailing address on Houston Avenue in Spokane and Hothi's Gmail address and cell phone number. Sapphire received this change of ownership letter returned as undeliverable several weeks later.

On October 4, Sapphire sent another letter to Par, mailing it to the 1st Avenue address and emailing it to Par's vice president of planning and business development. The letter stated,

> We are writing to discuss with you the legal effect of your purported leasehold interest in the above described property. As you know, Washington, like most states, has a statute of frauds applicable to real estate transactions. That statute requires that all transactions affecting real estate be in writing and include a legal description of the at-issue property. As you are aware, the purported lease does not include a legal description of the Property. We therefore deem the relationship described under the purported lease to be, at best, a month-to-month tenancy.

> We are writing in an effort to agree-on a commercially reasonable process for you to surrender the premises, as we would like to regain possession over it upon the conclusion of an agree[d]-to end of the lease.

CP at 60. This letter was not on official Sapphire letterhead. It provided Hothi's cell phone number and a Gmail address, but no email associated with Sapphire, and it was the first notice of the sale that Par actually received from Sapphire.

Par's vice president forwarded this email to Par's general counsel. Par's general counsel testified that this was a "very odd letter" and "raised alarm bells" for potential fraud. Verbatim Rep. of Proc. (VRP) (Feb. 20, 2024) at 42-43. The next day, October 5, Par's general counsel drafted a letter disputing Sapphire's statute of frauds claim and asking Hothi to "send us a copy of

6

the acquisition agreement by which you purchased the Premises, along with your W-9 and routing details for our monthly rental payments." Ex. P1. At trial, Par's general counsel testified that he sent this letter to Sapphire, but there is no documentation of it being sent. And he did not testify about the specific date that he sent the letter.

D.     October and November Rent

On October 14, Hothi told his real estate agent that he believed Vandervert received October rent from Par and asked to pick up this rent check. Vandervert replied on October 15 that it had not deposited Par's October rent check and had mailed the check back to Par, seemingly to Par's 1st Avenue address. The real estate agent suggested that Hothi reach out to Par to ask for a reissued October rent check.

Instead, on Saturday, October 16, Hothi sent a notice of default to the 1st Avenue address, claiming that Par failed to pay October rent, failed to name the landlord as an additional insured on its general liability insurance, and failed to provide a sufficient certificate of property insurance under the lease. Sapphire attached a certificate of property insurance with Vandervert listed as a loss payee. Sapphire also posted this notice on the door of the property on the same evening. Per the default terms of the lease, the notice gave Par 10 days to cure the rent issue and 30 days to cure the insurance issues. On October 17, Par learned for the first time that its October rent paid to Vandervert had been returned.

On October 20, Par's general counsel called Hothi and left a message. The next day, October 21, Hothi emailed Par's general counsel, asking him to direct all rent payments to the Houston Avenue address. The email also stated that Par's most recent insurance certificate did not

7

comply with the lease and that Sapphire had not received a response to its October 4th letter "discussing the fact that [the] lease is a month to month lease." Ex. D121, at 77.

The same day, October 21, Par's general counsel replied, attaching his October 5 letter disputing Sapphire's statute of frauds argument. He stated, "[w]e mailed you a copy of the attached letter earlier this month. We need documentary proof of your ownership, as well as your payment instructions (e.g., bank account information), so we can redirect our rent payments." Ex. P1.

Par used an automated rent payment system. In order to set up automatic rent payments, Par needed to input a landlord as a vendor in its system using the landlord's tax forms and other validating information. This automated system could distribute electronic payments or paper checks as soon as a landlord was set up as a vendor. Par's general counsel explained that Par's manual process for sending unautomated checks could take anywhere from one to three weeks.

On October 26, Par's general counsel and Hothi spoke on the phone. At trial, Hothi testified that Par's general counsel's tone was "[v]ery hostile" during this call. VRP (Feb. 21, 2024) at 280. Hothi stated that he told Par's general counsel that Sapphire would not provide bank information and wanted a manual check. Hothi also claimed that Par's general counsel said he would let Par know about this request. Hothi testified that Par's general counsel did not mention Sapphire providing proof of ownership.

Par's general counsel testified that during this phone call, he explained the automated rent payment system to Hothi and Hothi "didn't say a lot. He said, okay, I'll get back to you, something along those lines." VRP (Feb. 20, 2024) at 48. Par's general counsel denied that his tone was hostile, instead stating that the conversation was "collegial." *Id.* at 50.

Also on October 26, Par's general counsel sent a follow-up email to Hothi: "As we discussed, please provide proof of ownership of the property, as well as where you want us to direct our rental payments (bank account information). We will also send an updated certificate of insurance." Ex. D121, at 76.

On November 2, Par's general counsel emailed Hothi again asking for proof of ownership and bank account information to "enable [Par] to pay rent." Ex. D125, at 15.

On November 3, Par's vice president of retail operations spoke with Hothi on the phone. He sent a follow-up email to Hothi after this call, copying Par's retail manager in Spokane: "so that we can get you set up for payment. We look forward to working with you and will get this processed as quickly as possible." Ex. D122, at 13.

Par's retail manager reached out to Hothi the same day, November 3, stating, "I have a few forms that need to be filled out, so I can get you set up as a vendor for payment. If you can get these back to me ASAP, I will get a check to you on [November 9] for Oct and Nov. I will also need a W9." *Id.* Hothi did not respond to these emails or provide the necessary paperwork.

On November 5, Sapphire posted at the property and mailed to the 1st Avenue address a three-day notice for Par to pay October rent or vacate the premises under the unlawful detainer statute, RCW 59.12.030(3). Sapphire had previously given Par notice of default related to October rent, but Sapphire did not send to Par or post any notice of default related to the November rent. So this unlawful detainer notice addressed only October rent, not November rent.

On November 9, Sapphire emailed Par and mailed to the 1st Avenue address a notice terminating the lease immediately due to nonpayment of October rent.

9

On November 10, Par sent Sapphire rent checks for October and November to Sapphire's Houston Avenue address, which were scheduled to be delivered November 12. Sapphire does not dispute that it received October and November rent by November 12.

On November 16, Sapphire emailed and mailed Par a different notice terminating the lease "due to [Par's] failure to maintain appropriate insurance." CP at 83.

On December 1, Sapphire sent Par a notice of termination under RCW 59.12.030(2), Washington's unlawful detainer statute. This subsection provides that continued possession of property is unlawful after the end of an indefinite month-to-month periodic term, so long as the landlord gives at least 20-days' notice that the tenant must vacate. RCW 59.12.030(2). The notice explained that Par had failed to cure its defaults involving unpaid rent and failure to comply with the insurance requirements in the lease. The notice claimed that these breaches of the lease terminated the lease and converted the tenancy to a month-to-month term under the holdover provision in the lease. The notice stated that Par would have to leave the property and surrender possession of the property to Sapphire by December 31.

Par continued to occupy the property and pay Sapphire rent, but as of the time of trial, Sapphire had not deposited any of Par's rent checks.

Multiple times during the bench trial, Hothi denied that Sapphire bought the property intending to evict Par.

E.       Insurance Policies and Certificates

1.       General liability insurance

General liability insurance insures Par against damages to a third party. Par's general liability insurance policy that was effective from September 30, 2021, to September 30, 2022,

stated that it would "pay those sums that the insured and any 'additional insured' as far as applicable becomes legally obligated to pay." Ex. D111, at 22. Under the policy, "additional insured" meant "any person or entity to whom the 'insured' is obliged by an 'insured contract' . . . to provide insurance such as is afforded by this insurance." *Id.* An "insured contract" is defined as "any written contract or agreement entered into by the '[i]nsured' where the '[i]nsured' assumes the tort liability of another party." *Id.*

Par submitted at trial a certificate of general liability insurance from September 28, 2021 listing Vandervert as the certificate holder. But the certificate specifically marked "N" under the "additional insured" column, signifying that the certificate holder was not an additional insured. Ex. D108, at 14. Par also submitted a certificate of general liability insurance dated November 17, 2021 that listed Sapphire as the certificate holder, but it too marked "N" under the additional insured column. Ex. D133, at 90.

These marks were apparently in error. Elsewhere on the page, the certificates also stated that the certificates themselves conferred no rights to the holder; the actual insurance policies identified additional insureds and endorsements. On November 17, Par's insurance manager emailed Par's general counsel with certificates of insurance attached, and Par's general counsel replied that he would "handle distribution." Ex. D136, at 112.

On December 22, the company that managed Par's insurance certificates emailed Par's insurance manager with an updated certificate of general liability insurance listing Sapphire as the certificate holder and this time marking "Y" in the additional insured column. Ex. D141, at 126. The company stated that it would mail the certificate to Sapphire's Houston Avenue address.

Despite the errors in the certificates, Par's insurance manager testified that Par maintained the required general liability insurance coverage for the property at all times. He stated that a certificate of insurance is "not a legal document," but instead "a convenience mechanism" to demonstrate that a party has insurance. VRP (Feb. 20, 2024) at 164. Sapphire did not argue at trial that Par lacked the required liability insurance with the required limits, nor did it argue that Sapphire was not covered during any portion of the coverage period, nor did it dispute the documentary evidence of Par's insurance coverage. Instead, Sapphire argued that it was nevertheless entitled to terminate the lease because Par failed to provide it with the correct certificate and failed to timely cure this breach of the lease after notice.

2.      Property insurance

Property insurance insures the physical property itself. Par's property insurance policy that was effective September 30, 2021, to September 30, 2022, covered property "owned, used, leased or rented by the Insured . . . or which the Insured has agreed to insure or is legally responsible to insure." Ex. D111, at 53.

The policy defined "additional insured" as all parties "specifically named or falling within the general description stated in the Declarations." *Id.* at 62. The declarations listed "additional insureds" as all parties "required by written contract with the Named Insured." *Id.* at 51. The declarations also listed "named insured" as "any other party in interest that is required by contract . . . to be named as an Insured." *Id.*

Regarding certificates, the property insurance policy stated,

All parties to whom Certificates of Insurance have been issued are automatically added to this policy upon issuance of said certificates either as an Additional Insured or as Loss Payee or both, in accordance with the terms and conditions of said certificates. . . . Certificates are issued as a matter of information only and

confer no rights upon the additional interest named below, and they do not amend, extend, or alter the coverage afforded by this policy. Coverage under this policy can only be amended, extended or altered by endorsement.

Ex. D111, at 61.

During trial, Par's insurance manager testified that Par maintained the required property insurance coverage for the property at all times. He also testified that Sapphire was a loss payee covered by Par's property insurance because "if it's listed in the lease, it's covered by the policy." VRP (Feb. 20, 2024) at 172. Under his understanding of the policy, the "'any other party in interest that is required by contract'" language satisfied the lease's requirement that Sapphire be listed as a loss payee. *Id.* at 205.

Sapphire obtained its own property insurance for the three years after its purchase of the property, which cost about $6,000 per year, or $18,000 total.

## II. TRIAL COURT PROCEEDINGS AND RULING

On December 13, 2021, Par filed a lawsuit against Sapphire claiming, as relevant to this appeal, that Sapphire breached the lease, and that it breached the covenants of quiet enjoyment and good faith and fair dealing. Par sought injunctive relief in the form of a determination that Par had complied or substantially complied with the lease and the lease was still effective.

On January 14, 2022, Sapphire filed a complaint against Par for unlawful detainer, seeking to evict Par and restore possession of the property to Sapphire, as well as money damages. The trial court consolidated the cases.

Before trial, the trial court granted Sapphire's motion for partial summary judgment, finding that Sapphire properly served Par notices on October 16, November 5, and December 1, 2021, and Par failed to comply with these notices. However, the trial court also noted that it did

"not conclude as a matter of law that [Par] breached the lease by failing to comply with the notices. Questions of fact may exist as to why [Par] failed to comply with the notices and whether the certificate of insurance was timely provided and sufficient." CP at 108.

After a bench trial, the trial court ruled that the lease was binding and enforceable, and that Par was not unlawfully detaining the property.

A.      October and November 2021 Rent

The trial court found that Par paid October rent and met its commitment under the terms of the lease by mailing a rent check to Vandervert on September 29 before Sapphire took ownership of the property.

The trial court found that Par did not pay November rent on time, thereby technically breaching the lease. But it concluded that this was not a material breach because Sapphire contributed by failing to cooperate with Par's attempts to arrange payment. The trial court concluded that Sapphire breached the implied covenant of good faith and fair dealing inherent in all contracts by sending Par default notices for nonpayment of rent when Sapphire knew that the October rent had been paid and by refusing to cooperate with Par to facilitate payment of rent. The trial court also concluded that Par's untimely payment of November rent was not a material breach of the lease because Par paid November rent only "one day after the default timeline." CP at 238 (Findings of Fact (FF) 58.9). However, Sapphire did not ever give Par a notice of default for failure to pay November rent; it only did so for October rent.

B.      Insurance Coverage

The trial court concluded that Par's general liability insurance policy met the lease requirements and covered Sapphire as an additional insured. However, the trial court also

14

concluded that Par breached the lease by "failing to produce an accurate certificate until December 22, 2021." CP at 239 (FF 59.5). But the trial court noted that this was not a material breach because providing a certificate of insurance is an administrative function and Par provided Sapphire with substantively sufficient general liability insurance in compliance with the lease.

The trial court concluded that Par's property insurance policy met the lease requirements and Par was not required to provide Sapphire with a certificate of property insurance to include Sapphire as a loss payee. The trial court stated that it found Par's insurance manager's testimony that the policy covers the landlord as an additional insured and loss payee credible.

The trial court concluded that Sapphire breached the implied covenant of good faith and fair dealing inherent in all property contracts by threatening default for Par's failure to provide a certificate of property insurance.

## C.     Other Findings, Conclusions, and Costs

The trial court found that Sapphire's claim that it did not buy the property with intent to evict Par was not credible. Instead the trial court found that Sapphire engaged in a "concerted effort" to evict Par. CP at 241 (FF 68.4).

The trial court concluded that Sapphire breached the lease's covenant of quiet enjoyment by posting a notice of default on the property on October 18 and a three-day notice to pay or vacate the property on November 5 because Sapphire knew that Par had paid Vandervert for October rent and refused to cooperate with Par to provide information so Par could pay rent to Sapphire.

The trial court concluded that the lease did not violate the statute of frauds because even though the lease lacked a legal description of the property, partial performance had occurred: Par had actual and exclusive possession of the property, paid rent, and made improvements to the

property. The trial court concluded that Sapphire breached the implied covenant of good faith and fair dealing by sending the October 4 letter stating that the lease was void due to the statute of frauds without legal justification.

The trial court also concluded that because Par did not materially breach the lease, Par was not required to comply with Sapphire's unlawful detainer notices. The trial court dismissed Sapphire's unlawful detainer action with prejudice. The trial court awarded Par costs associated with the case as a prevailing party.

Sapphire appeals.

## ANALYSIS

Among other issues, Sapphire argues that the trial court erred by concluding that Sapphire could not terminate the lease due to Par's late payment of October rent. Sapphire also argues that the trial court erroneously concluded Sapphire could not terminate the lease because Par's failure to provide an accurate general liability insurance certificate was not a material breach. Sapphire contends the trial court erred by concluding that Par satisfied the terms of the lease because Sapphire was a loss payee under Par's property insurance policy.

Although we agree with Sapphire that Par did not provide it with a certificate of property insurance that specifically named Sapphire as a loss payee, this was not a material breach of the lease. We disagree with Sapphire in all other respects.

### I. STANDARD OF REVIEW

When reviewing a trial court's decision after a bench trial, we determine whether substantial evidence supports the trial court's findings of fact and whether those findings of fact support the trial court's conclusions of law. *Nguyen*, 179 Wn. App. at 163. "The label applied to a

16

finding or conclusion is not determinative; we 'will treat it for what it really is.'" *Id.* (quoting *Para-Med. Leasing, Inc. v. Hangen*, 48 Wn. App. 389, 397, 739 P.2d 717 (1987)).

We presume a trial court's findings of fact are correct, and the party challenging a finding has the burden of demonstrating that substantial evidence does not support the finding. *Id.* Substantial evidence is "evidence sufficient to persuade a rational and fair-minded person that the premise is true." *Id.* To determine whether the record contains sufficient evidence, we need only consider "evidence favorable to the prevailing party." *Id.* We do not reweigh the evidence, and we defer to the trial court on questions of witness credibility. *Id.* "Unchallenged findings of fact are verities on appeal." *Id.* Erroneous findings of fact that do not materially affect the conclusions of law are harmless error. *Skagit County Pub. Hosp. Dist. No. 1 v. Dep't of Revenue*, 158 Wn. App. 426, 449, 242 P.3d 909 (2010).

## II. PAYMENT OF RENT

A.      October 2021 Rent Payment

    1.      Lease requirements

Sapphire challenges the trial court's conclusion that Par timely paid October rent under the terms of the lease when it paid Vandervert on September 29. Sapphire argues that Par's failure to pay October rent on time after notice of default constituted a breach that was grounds for termination of the lease. We disagree.

The purpose of contract interpretation is to determine the parties' intent. *Kelley v. Tonda*, 198 Wn. App. 303, 311, 393 P.3d 824 (2017). Washington courts follow the objective manifestation theory of contracts, where we determine the parties' intent based on an agreement's objective manifestations, including what is written in the contract, rather than the parties'

unexpressed subjective intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503-04, 115 P.3d 262 (2005). We avoid interpreting contracts in ways that lead to absurd results. *Forest Mktg. Enters., Inc. v. Dep't of Nat. Res.*, 125 Wn. App. 126, 132, 104 P.3d 40 (2005). When a contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation and determination of the legal effect of a contract are questions of law that we review de novo. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 711-12, 334 P.3d 116 (2014).

Under the notice provision of the lease, Par did not receive notice about the change in ownership until three days after September 30, when Sapphire sent a letter to Par's 1st Avenue address. Accordingly, Par had no ability to pay *Sapphire* for October rent by October 1, which was the required payment date. And when Par made the rent payment on September 29 to Vandervert, Vandervert was still the owner of the property. So the trial court was correct that Par met the requirements of the lease when it made the September 29 payment to Vandervert for October rent.

Additionally, there is an unchallenged finding of fact that the first time Par learned that Vandervert had not given Sapphire its October rent was on October 17. The lease required that Par pay the property's landlord rent in advance before or on the first day of the month; it did not contain any language that governed the parties' obligations in this situation where the pending rent payment was not handled as part of the settlement when the property was sold. Therefore, after October 17, Par only had an obligation to pay Sapphire October rent within a reasonable time. There could be no default before Par became aware that its timely and proper October rent payment check had not actually been received by the correct party. Thus, any default notice issued before October 17 was invalid.

Finally, Par does not appear to dispute that it owed Sapphire October rent once it became clear that Vandervert had returned its October check uncashed. When Par knew that Sapphire was the owner and that Vandervert had not deposited the October rent check, Par paid Sapphire October rent, so Sapphire was made whole.

2.　　　Good faith and fair dealing

To the extent Sapphire argues that Par failed to pay October rent within a reasonable time of discovering it had not been paid, delaying until November 10, we agree with the trial court that Par was hindered by Sapphire's lack of good faith and fair dealing.

"In every contract there is an implied covenant of good faith and fair dealing [that] obligates the parties to cooperate with one another so that each may obtain the full benefit of performance." *Cavell v. Hughes*, 29 Wn. App. 536, 539, 629 P.2d 927 (1981). Generally, "the failure or nonoccurrence of a condition will not excuse the promisor's performance if the condition's failure was the fault of the promisor." *Id.* Moreover, hindering performance is just as bad as preventing performance. *Id.* The duty of good faith and fair dealing can arise even when there is no breach of an express contract term. *Rehkter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 111-12, 323 P.3d 1036 (2014).

However, the duty of good faith does not require a party to accept a material change in the terms of its contract. *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). The duty is not free-floating, but "arises only in connection with terms agreed to by the parties." *Id.* "As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms." *Id.* at 570. Bad faith includes, "evasion of the spirit of the bargain, lack of diligence and slacking off . . . and interference

19

with or failure to cooperate in the other party's performance." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (AM. L. INST. 1981).

*Cavell* provides a helpful example of interference with a contract condition amounting to bad faith. 29 Wn. App. at 536. In that case, the defendant signed an earnest money agreement for the sale of his house, which required the plaintiff buyer to be approved for membership by a country club. *Id.* at 537-38. However, after signing the agreement, the defendant decided that the price of the house was too low, so he consulted with an attorney to find a way to terminate the agreement. *Id.* at 538. The defendant's attorney sent a letter to the plaintiff denying defendant's obligations under the agreement because the plaintiff could not be approved under country club bylaws. *Id.* The plaintiff responded with a letter explaining why the bylaws did not apply to her. *Id.* The country club board of directors, including the defendant, then voted to deny plaintiff's membership. *Id.*

On appeal, this court concluded that the defendant breached the implied covenant of good faith and fair dealing. *Id.* at 539. The court found that he specifically intended to frustrate the sale of the house. *Id.* And he knew from the time he signed the agreement that the country club bylaws did not apply to the plaintiff, but he still attempted to revoke the agreement based on that argument. *Id.* at 540. He also allowed the country club to vote under the misconception that allowing the plaintiff to obtain membership would violate the bylaws, knowing that the effect of the board's vote would determine his obligations under the agreement. *Id.* at 539-40. The court thus held that the defendant could not terminate the agreement due to the plaintiff's breach of the membership condition because the defendant breached his duty of good faith and fair dealing. *Id.* at 540.

a.      Substantial evidence of bad faith

Sapphire challenges several factual findings supporting the trial court's conclusion that Sapphire acted in bad faith after purchasing the property. Sapphire has the burden to demonstrate that these factual findings are not supported by substantial evidence. *Nguyen*, 179 Wn. App. at 163.

i.      Sapphire's contribution to the delay of rent payments

First, Sapphire argues that substantial evidence does not support the trial court's findings that Sapphire hindered Par from timely paying October rent.

Sapphire contends that Par "had all the information it needed to pay rent." Appellant's Br. at 62. Sapphire notes that Hothi mailed a change of ownership letter on the day of closing, September 30, to Par's provided address with instructions on where to send rent payments. Hothi also emailed Par's general counsel on October 21 with the same information. Sapphire claims that the trial court erred by failing to acknowledge that Par never provided an updated address, which was its obligation under the lease. Sapphire additionally argues that no evidence demonstrates that Hothi ever told Par that he would provide Sapphire's bank account information for payment, so it was unreasonable for Par to expect this information was forthcoming. We disagree.

Here, it is certainly true that Par had unexplained failures that partially caused unnecessary delay in the rent payments to Sapphire. Par failed to update its mailing address and therefore delayed communication with Sapphire. Especially considering that Par is a large sophisticated corporation, Par also failed to appreciate the gravity of its delay in paying rent and it inexplicably failed to accelerate its rent payment system until November 10.

But a rational person could find, as the trial court did, that a significant cause of Par's failure to meet the rent deadlines was Sapphire's bad faith. The lease was silent as to Par's method of rent payment, so Sapphire's insistence that Par pay rent only with a manually issued paper check was not supported by the lease. The record contains evidence of phone calls and emails to Hothi from Par asking for information so that Par could input Sapphire as a vendor and provide automated rent payments or dispense rent checks through its automated system. Par further explained that paying rent by manual check, rather than dispensing a check through its automated system, could take up to three weeks, which is evidence that Par could not pay rent immediately to Sapphire's provided Houston Avenue address without additional information from Hothi.

Though Hothi testified that he told Par he would not provide bank account or other information for automatic payments, Par's repeated requests for this information and its internal confusion about Hothi's lack of response are sufficient circumstantial evidence that Hothi did not directly tell Par that he would not provide the requested information. Par was not unreasonable to want to obtain verification that Sapphire was the new owner of the property in light of the lack of letterhead and the personal Gmail address in Sapphire's initial communications with Par. But Sapphire did not provide information—proof of ownership, bank account information, or tax forms—that would allow Par to make efficient and automated rent payments, despite Par's repeated inquiries.

Par provided a mechanism for quick issuance of a check, but it needed basic information and forms that Sapphire refused to provide. And the record supports a conclusion that Sapphire did not communicate clearly that it would not provide this information, instead choosing to stop responding to Par's requests. We do not reweigh evidence, so we conclude that the trial court's

findings that Sapphire acted in bad faith by hindering Par's October rent payment were supported by substantial evidence.

ii.      Hothi's intent as evidence of bad faith

In addition to finding that Sapphire hindered Par's October rent payment, the trial court also found that Hothi wanted to evict Par and engaged in "a concerted effort" to do so. CP at 241 (FF 68.4). Sapphire acknowledges that it is unclear if the trial court relied on Hothi's alleged motives—terminating Par's lease to make more profitable use of the property—as a basis for Sapphire's liability, but claims that this reliance would be an error. However, the trial court's findings about Hothi's motives were relevant to whether he was acting in bad faith, as *Cavell* shows, and bad faith is relevant to the trial court's conclusion that Sapphire breached the covenant of good faith and fair dealing. 29 Wn. App. at 539. The trial court thus did not err if it relied on these findings for a determination of Sapphire's bad faith.

Additionally, assuming that the trial court relied on these findings about Hothi's motives, they are supported by substantial evidence. A rational person could conclude from the evidence that Hothi wanted to evict Par given the timing of his October 4 letter claiming violation of the statute of frauds, which was sent only four days after closing and before Par had the opportunity to even pay rent to Sapphire.[2] A rational person could accept the trial court's finding about Hothi's motives given Hothi's consistent actions attempting to evict Par despite Par's willingness to

---

[2] Sapphire does not reassert its claim that the lease is void because of the statute of frauds on appeal. Instead, Sapphire argues that the trial court erred by concluding that Sapphire breached its duty of good faith and fair dealing when it claimed that the lease violated the statute of frauds in its October 4 letter. But the trial court did not rely solely on the October 4 letter to determine that Sapphire acted in bad faith, nor did it impose liability or damages based on Sapphire's breach of its duty of good faith and fair dealing regarding the statute of frauds claim. Thus, we need not address this issue on appeal. RAP 3.1.

cooperate, and his acknowledgment that he believed Sapphire could get almost three times the amount of rent Par was paying. Finally, with regard to Hothi's testimony and motives, we defer to the trial court on questions of witness credibility, and we do not reweigh the evidence. *Nguyen*, 179 Wn. App. at 163.

b.      Bad faith as excuse for October rent payment delay

Sapphire also challenges the trial court's legal conclusion that Sapphire breached its duty of good faith and fair dealing regarding the October rent payment. Sapphire contends that it did not breach the duty of good faith and fair dealing because Sapphire itself did not fail to perform any term of the lease. Moreover, Sapphire contends it is not a breach of good faith and fair dealing to decline to perform acts it is not legally obligated to perform.

Here, Sapphire is correct that it did not independently breach a term of the lease. However, a party need not breach a term of the lease to breach its duty of good faith and fair dealing. Like in *Cavell*, the trial court here found that Hothi wanted to terminate the lease from the time of purchase. 29 Wn. App. at 539. Sapphire immediately pursued strategies to excuse its obligations under the lease, even if those strategies were based on tenuous legal bases. And Par demonstrated a consistent willingness to cooperate regarding rent payment, but Hothi did not provide necessary information for timely payment and stopped responding to Par's requests for that information. Sapphire's actions are at least as problematic as the defendant's in *Cavell*, who breached his duty of good faith by failing to provide necessary information. *Id.* at 539-40. Moreover, even if Par could have expedited its manual check process, it would not have known to start that process because Sapphire did not communicate that it was not willing to facilitate automated payments at all.

24

The trial court's findings of fact support the conclusion that Sapphire acted in bad faith. *See Nguyen*, 179 Wn. App. at 163. Thus, the trial court did not err by concluding that Sapphire breached its implied duty of good faith and fair dealing.

The trial court's findings thus support its conclusion of law excusing Par's failure to pay Sapphire October rent until November 10 because Sapphire breached its implied duty of good faith and fair dealing.

B.    November 2021 Rent Payment

Sapphire challenges the trial court's conclusions of law excusing Par's late payment of November rent. However, both parties agree that Sapphire never sent a notice of default related to November rent, a prerequisite to termination, so the late payment of November rent could not be a basis to terminate the lease or proceed with an unlawful detainer action.[3]

C.    Additional Issues

Sapphire challenges several individual findings of fact related to Par's payment of rent and Sapphire's resulting default notices. Par responds that a number of these challenged findings are not prejudicial, even if they are erroneous.

Sapphire first contends that substantial evidence does not support the trial court's finding that the October 16 default notice was not posted on the door of the property until October 18. This

---

[3] Sapphire also argues that the trial court was incorrect to find that Sapphire acted in bad faith when it alleged in its unlawful detainer action that Par breached the lease by paying November rent late and by arguably relying on this alleged breach as a basis for termination of the lease and unlawful detainer action. Sapphire did allege the late November rent payment was a breach, and it alleged that "failing to pay Sapphire the rent when due under the Lease" was a basis for unlawful detainer. CP at 307. But Sapphire never gave Par a default notice or an unlawful detainer notice with regard to November rent. Although we do not rely on the trial court's finding of bad faith with regard to inclusion of allegations about November rent in the unlawful detainer complaint, these facts are sufficient to support the trial court's finding, given that we do not reweigh the facts.

finding of fact, even if erroneous, does not materially affect the conclusions of law in this case. The trial court concluded that Par properly paid October rent payment—and failed to timely meet insurance certificate requirements—regardless of whether this notice was posted on October 16 or October 18.

Sapphire additionally challenges the trial court's finding that Hothi knew Par did not receive mail at its listed 1st Avenue address when he sent the October 16 default letter to that address. Sapphire argues that it is not clear whether Hothi knew when he sent the default letter on October 16 that the change of ownership letter with Sapphire's mailing address was undelivered.

Par argues that this alleged error had no effect on the trial court's decision because Hothi testified that he learned the address was obsolete a couple of weeks after he sent the change of ownership notice on September 30 and he continued to send notices there regardless.

We agree that this finding of fact does not impact the trial court's conclusions of law. The trial court found that Sapphire posted the October 16 default letter at the property, so Sapphire provided Par with this notice. And Sapphire does not dispute that Hothi continued to send communications to Par's 1st Avenue address after he knew that it was obsolete, whenever that knowledge occurred. Thus, even if the challenged finding was adopted in error, any error was harmless.

III. INSURANCE COVERAGE

A.      General Liability Insurance

Sapphire argues that the trial court erred by excusing Par's failure to provide an accurate certificate of general liability insurance until December 22 because this was not a material breach of the lease. The trial court concluded that the breach was not material because Par's required

26

general liability insurance coverage never lapsed, and "[p]roviding an accurate certificate of insurance is an administrative function of the policy and the lease, not a substantive function." CP at 239 (FF 59.6). Sapphire argues that the trial court erred by determining that default and termination remedies are limited to "material" breaches of the lease. Appellant's Br. at 52. Sapphire contends that default and termination of the lease were negotiated contract remedies. And Sapphire claims that under the lease, "any failure to perform was a basis for giving a notice of default." *Id.* at 55.

As an initial matter, Sapphire challenges the trial court's finding of fact that Par sent Sapphire a certificate of general liability insurance on November 17, 2021. Par argues that this error is irrelevant because the trial court ultimately concluded that Par breached the lease by failing to produce an accurate certificate of insurance until December 22. We agree with Par. This finding of fact does not impact the trial court's conclusions of law. The trial court determined that Par breached its duty under the lease by failing to provide an accurate certificate of general liability insurance until December 22.

Any failure to perform when performance is due is a breach of contract that entitles the non-breaching party to damages. *Colo. Structures, Inc. v. Ins. Co. of the W.*, 161 Wn.2d 577, 589, 167 P.3d 1125 (2007). However, generally only a material breach will completely discharge the non-breaching party's duty to perform. *224 Westlake, LLC v. Engstrom Props., LLC*, 169 Wn. App. 700, 725, 281 P.3d 693 (2012). "A material breach is one that 'substantially defeats' a primary function of an agreement." *Id.* at 724. "Substantial performance is said to be the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance

by the other party is excused." *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wn. App. 205, 220, 317 P.3d 543 (2014). It is well established in Washington that forfeiture is a drastic remedy that courts should avoid unless justice cannot be done otherwise. *Stevenson v. Parker*, 25 Wn. App. 639, 647, 608 P.2d 1263 (1980). Here, Sapphire seeks forfeiture of an entitlement to lease the property until 2043.

Washington courts have applied a list of five factors to consider when determining whether a breach is material:

> (1) whether the breach deprives the injured party of a benefit which [they] reasonably expected, (2) whether the injured party can be adequately compensated for the part of that benefit which [they] will be deprived, (3) whether the breaching party will suffer a forfeiture by the injured party's withholding of performance, (4) whether the breaching party is likely to cure [their] breach, and (5) whether the breach comports with good faith and fair dealing.

*Bailie Commc'ns, Ltd. v. Trend Bus. Sys.*, 53 Wn. App. 77, 83, 765 P.2d 339 (1988).

Materiality is a question of fact that depends on the circumstances of each particular case. *DC Farms*, 179 Wn. App. at 221. We review the trial court's determination of materiality for substantial evidence. *See 224 Westlake*, 169 Wn. App. at 724; *Bailie Commc'ns*, 53 Wn. App. at 82.

Additionally, because forfeitures are not favored in the law,

> "courts should promptly seize upon any circumstance arising out of the contract or relations of the parties that would indicate an election or an agreement to waive the harsh, and at times unjust, remedy of forfeiture . . . . Equity will enforce forfeitures when it is the contract of the parties that it shall be so. But before making its decree it will consider every agreement, every declaration, and every relation of the parties arising out of the contract; and if there by anything that warrants a finding that the parties have resolved anew, it will so decree."

*Stevenson*, 25 Wn. App. at 647 (quoting *Spedden v. Sykes*, 51 Wash. 267, 272, 98 P. 752 (1908)).

Here, the trial court properly determined that the failure to provide an accurate certificate of general liability insurance until December 22 was not a material breach of the lease and thus did not justify termination. Sapphire concedes that it was always covered by proper general liability insurance as an additional insured. The "N" notation on the certificate that indicated Sapphire was not an additional insured was an administrative mistake that could be corrected easily and did not impact Sapphire's actual coverage. Ex. D108, at 14; Ex. D133, at 90. Par ultimately cured this administrative breach by providing Sapphire with an updated certificate, and Par made efforts to procure an updated certificate in November. Par would suffer a significant forfeiture if Sapphire terminated the lease, losing the benefit of being able to rent the property until 2043 at the rental rates established in the lease. Thus, under the materiality factors, Par's failure to provide an accurate certificate was not material and it did not justify termination.

Moreover, this is a situation where the case law allows us to apply principles of equity. It seems absurd to allow termination of a multidecade lease based on the failure to provide a certificate that simply confirmed liability coverage for Sapphire that all of the parties agree was in place and complied with the lease requirements. And despite Sapphire's insistence that the lease should be strictly construed, the lease contained language suggesting that the parties intended to allow extensions of the cure period to avoid unnecessary forfeiture. Given Sapphire's breaches of the implied covenant of good faith and fair dealing, Sapphire's unwillingness to communicate with Par, and Par's continued efforts to provide Sapphire with an accurate certificate of general liability insurance, principles of equity also support the trial court's conclusion that forfeiture was inappropriate in these circumstances. Additionally, because Sapphire was not deprived of insurance coverage, no compensation for the failure to provide a certificate is necessary.

B.      Property Insurance

Sapphire challenges the trial court's conclusion that Sapphire was added to Par's property insurance policy as a loss payee, which was a requirement of the lease.

Vandervert was expressly included as a loss payee on Par's certificate of property insurance. Sapphire argues that Par had to obtain and provide Sapphire with a new certificate of property insurance expressly listing Sapphire as a loss payee in order for Sapphire to become a loss payee under the terms of the insurance policy. Sapphire states in its briefing that loss payee status is important because it allows Sapphire to bring a direct claim and directly recover from the insurance company, instead of having to potentially sue Par to receive payment for damages. However, Sapphire also states that it is "loss payee" *or* "additional insured" status that enables a third party to recover a claim directly from the insurer.

The interpretation of an insurance policy is a question of law. *Wright v. Safeco Ins. Co. of Am.*, 124 Wn. App. 263, 271, 109 P.3d 1 (2004). But when coverage turns on a particular fact situation, "the issue is a mixed question of law and fact." *Est. of Adams v. Great Am. Ins. Cos.*, 87 Wn. App. 883, 886-87, 942 P.2d 1087 (1997).

Here, the lease language sweeps broadly, stating that Par's property insurance "shall insure Tenant and the Landlord as their interests may appear," and that the "Landlord is added as a loss payee under such property insurance policy," so there is no dispute that Sapphire was entitled to coverage for damage to its property under the lease. CP at 46. The loss payee language in the property insurance policy is specific: a party is added as loss payee upon issuance of a certificate

30

that notes the party as a loss payee. Our record does not contain a certificate naming Sapphire as a loss payee.[4]

However, even if the trial court erred because Par did not add Sapphire as a loss payee on a certificate, any technical breach would not be material. Under the terms of Par's property insurance policy, Sapphire is at minimum an additional insured, if not a named insured. The policy language defined named insureds as all parties "required by contract . . . to be named as an Insured." Ex. D111, at 51. And it defined an additional insured as all parties "required by written contract with the Named Insured." *Id.* Pairing this with the broad language of the lease—a written contract between Sapphire and Par—and the language that stated the landlord "is added as a loss payee," Sapphire has an interest in the property as a named insured or additional insured under the property insurance policy. CP at 46.

In its briefing, Sapphire acknowledges that both loss payee *and* additional insured status allow a party to directly recover from the insurer. And Sapphire claims that this is the benefit it sought under Par's insurance policies. Thus, under a materiality analysis, Sapphire received the benefit of insurance that it reasonably expected. Because any breach for failing to provide a certificate expressly adding Sapphire as a loss payee was not material, the trial court did not err by concluding that Sapphire could not terminate the lease.[5]

---

[4] Sapphire argues that the trial court erred by relying on Par's insurance manager's lay opinion testimony to resolve issues of fact regarding Par's insurance policies. However, because we rely only on the language of the lease and the property insurance policy, we need not address this issue.

[5] Although Sapphire did not raise this issue in its briefing to this court, we note that at the trial court, Sapphire requested $18,000 in damages for the property insurance it purchased during the time it was not listed as loss payee on a property insurance certificate from Par. Sapphire also acknowledges that both a loss payee and an additional insured could directly recover from the insurer. Because Sapphire was fully covered as a named or additional insured under the property

IV. OTHER ARGUMENTS

A.    Covenant of Quiet Enjoyment

Sapphire argues that the trial court erred by concluding that Sapphire breached the covenant of quiet enjoyment by threatening to evict Par from the property absent a right to terminate. However, we need not reach this issue because Sapphire is not aggrieved by the trial court's conclusion. Under RAP 3.1, "[o]nly an aggrieved party may seek review by the appellate court." A party is only aggrieved by a decision that adversely affects that party's property, pecuniary, or personal rights or imposes a burden or obligation on that party. *Randy Reynolds & Assocs. v. Harmon*, 193 Wn.2d 143, 150, 437 P.3d 677 (2019).

Here, the trial court did not impose any liability or damages based on Sapphire's breach of the covenant of quiet enjoyment, so we need not address this issue further on appeal.

B.    Remedies Under the Unlawful Detainer Statute

Because we conclude that the trial court did not err when it determined that Sapphire was not entitled to terminate the lease based on nonpayment of rent or failure to provide the required insurance certificates, Sapphire is not entitled to any of the remedies it seeks under the unlawful detainer statute.

In its reply, Sapphire argues that the unlawful detainer statute does not allow courts to grant equitable relief denying forfeiture. But this is incorrect.

---

insurance policy and could insist on being paid directly, there was no reason for Sapphire to get a separate policy. Thus, there is no reason for this court to address this issue further.

Par cites *Munden v. Hazelrigg*, 105 Wn.2d 39, 45, 711 P.2d 295 (1985), which acknowledges that a party to an unlawful detainer action under RCW 59.12.030 is entitled to argue equitable defenses that excuse a tenant's breach.

On November 5, Sapphire provided Par with a 3-day notice to pay or vacate based only on Par's failure to cure payment of October rent to Sapphire within the default timeline. The notice cited subsection RCW 59.12.030(3) of the unlawful detainer statute. However, under principles of equity, failure to pay October rent to Sapphire was not a basis for termination or unlawful detainer under RCW 59.12.030(3) because the trial court correctly concluded Sapphire violated the covenant of good faith and fair dealing when it failed to cooperate in setting up rent payments, Par had met its obligation to pay October rent by paying Vandervert, and it paid Sapphire within a reasonable time of learning that its October rent payment had been made to the wrong party.

Moreover, unlike its November 5 notice to pay or vacate, Sapphire's December 1 notice of termination specifically stated it was relying on RCW 59.12.030(2). This subsection provides that continued possession of property is unlawful after the end of an indefinite month-to-month term, so long as the landlord gives at least 20-days' notice. RCW 59.12.030(2). The December 1 notice explained that Par had failed to cure its defaults involving unpaid rent and failure to comply with the insurance requirements in the lease, this resulted in termination of the lease, and the lease was therefore converted to a month-to-month tenancy under the holdover provision. But RCW 59.12.030(2) only applies if the lease was first validly terminated.

Sapphire's argument ignores that given the content of its December 1 unlawful detainer notice, *termination of the lease* based on failure to pay October rent or failure to provide adequate certificates of insurance was a prerequisite to its unlawful detainer action. Failure to provide timely

33

and adequate certificates of insurance did not justify unlawful detainer under RCW 59.12.030(2) because these failures did not warrant termination of the lease, a prerequisite to unlawful detainer under the subsection relied upon. As a result, because Sapphire is not entitled to termination of the lease, it is not entitled to unlawful detainer.

## COSTS

Sapphire contends that the trial court erroneously granted costs below. Sapphire argues that if we reverse the trial court's decision on the merits, the costs granted to Par should be reversed and this court should award costs to Sapphire under RCW 4.84.010. Because we affirm the trial court's decision, Sapphire is not a prevailing party, and we affirm the trial court's determination of costs.

## CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
GLASGOW, J.

We concur:

_____
MAXA, J.

_____
CRUSER, C.J.